# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ———————————————— | : | |
| JOSE MARRERO | : | |
| | : | |
| Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. 00 - 2155 |
| MARTIN HORN, Commissioner, | : | |
| Pennsylvania Department of Corrections; | : | **Honorable Donetta L. Ambrose** |
| GREGORY WHITE, Superintendent of the | : | **Chief USDJ** |
| State Correctional Institution at Pittsburgh, and | : | |
| JOSEPH P. MAZURKIEWICZ, | : | **Electronically Filed** |
| Superintendent of the State Correctional | : | |
| Institution at Rockview, | : | **Capital Habeas Corpus** |
| | : | |
| Respondents. | : | |
| ———————————————— | : | |

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF FOUR GUILT PHASE CLAIMS

Michael Wiseman
Shawn Nolan
James McHugh
Capital Habeas Corpus Unit
Federal Community Defender Office for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner, Jose Marrero

Dated:       Philadelphia, PA
             December 3, 2007

TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RELEVANT PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

EACH OF THE GUILT PHASE CLAIMS ARE EXHAUSTED
AND ARE NOT PROCEDURALLY DEFAULTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CLAIM B.        PETITIONER WAS DENIED HIS RIGHTS UNDER THE SIXTH, EIGHTH AND
                FOURTEENTH AMENDMENTS WHEN HE WAS TRIED WHILE
                INCOMPETENT TO PROCEED. THE TRIAL COURT ERRED IN NOT
                CONDUCTING COMPETENCY PROCEEDINGS AND TRIAL COUNSEL WAS
                INEFFECTIVE FOR FAILING TO LITIGATE PETITIONER'S OBVIOUS
                INCOMPETENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                1.      Petitioner was Incompetent at the Time of Trial . . . . . . . . . . . . . . . . . . . 10

                2.      Trial Counsel Was Ineffective For Failing to Request a
                        Competency Evaluation and Hearing, and the Trial Court
                        Erred in Not Providing Such a Hearing . . . . . . . . . . . . . . . . . . . . . . . . . 18

                3.      The Supreme Court's Opinion on this Issue is Contrary To
                        and an Unreasonable Application of 28 U.S.C. § 2254 . . . . . . . . . . . . . . 23

CLAIM D.        PETITIONER'S FIRST DEGREE MURDER CONVICTION (AND RESULTING
                DEATH SENTENCE) WAS OBTAINED IN VIOLATION OF HIS SIXTH
                AMENDMENT RIGHT TO EFFECTIVE COUNSEL BECAUSE HIS TRIAL
                ATTORNEY FAILED TO INVESTIGATE, DEVELOP AND PRESENT A
                DIMINISHED CAPACITY DEFENSE AT THE GUILT STAGE OF TRIAL . . . . . . . . . . . 25

CLAIM E.        PETITIONER'S CONFESSIONS WERE ADMITTED AT TRIAL IN
                VIOLATION OF HIS RIGHTS SECURED BY THE FIFTH, SIXTH AND
                FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION,
                BECAUSE HIS MULTIPLE MENTAL HEALTH DEFICITS RENDERED HIM
                UNABLE TO MAKE A KNOWING AND INTELLIGENT WAIVER OF HIS
                MIRANDA RIGHTS AND ANY SUCH PURPORTED WAIVER OF THESE
                RIGHTS WAS INVOLUNTARY. TRIAL COUNSEL WAS INEFFECTIVE FOR
                FAILING TO LITIGATE THIS CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

CLAIM H.    PETITIONER'S CONFESSION WAS OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS IT WAS THE PRODUCT OF HIS WARRANTLESS ARREST. TRIAL COUNSEL WERE ALL INEFFECTIVE FOR FAILING TO LITIGATE THIS CLAIM . . . . . . . . . . . . 33

CONCLUSION    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## PRELIMINARY STATEMENT

Pursuant to the joint request of the parties, this matter is back before this Court for the limited purpose of reviewing Petitioner's habeas corpus claims related to the guilt phase of his capital trial. The guilt phase claims are identified in his *Petition for Writ of Habeas Corpus* (hereafter, *Petition*) as Claim B (trial competency), Claim D (counsel's ineffective failure to investigate and present a diminished capacity defense), Claim E and H (Petitioner's confessions were used in violation of several constitutional rights).

The record of the state court proceedings will be referred to as Notes of Testimony and will be cited as "NT" followed by a date and page reference. The Pennsylvania Supreme Court has issued two substantives opinions regarding Petitioner, Commonwealth v. Marrero, 687 A.2d 1102 (Pa. 1997), certiori denied, Marrero v. Pennsylvania, 522 U.S. 977 (1997) (direct appeal); and Commonwealth v. Marrero, 748 A.2d 202 (Pa. 2000) (affirming denial of state post-conviction relief). These opinions will be cited as Marrero 1 and 2, respectively. The Pennsylvania Supreme Court's order remanding to the lower state court his post-conviction petition for relief under Atkins v. Virginia, 536 U.S. 304 (2002), is reported at Commonwealth v. Marrero, 909 A.2d 802 (Pa. 2006) and will be cited as Marrero 3.

## RELEVANT PROCEDURAL HISTORY

Jose Marrero was convicted of first degree murder and sentenced to death in the Court of Common Pleas, Erie County, Pennsylvania (Docket Nos. 645 A & B) (Honorable Shad Connelly, presiding). The Pennsylvania Supreme Court affirmed Petitioner's conviction on direct appeal. Marrero 1. Petitioner was represented at trial and on direct appeal by Timothy Lucas. He was represented on certiorari proceeding by Daniel Givelber of Boston, Massachusetts.

1

Shortly after the denial of his petition for certiorari, on December 22, 1997 Petitioner filed a pro se petition for post-conviction relief pursuant to the Pennsylvania Post-Conviction Relief Act, 42 Pa.C.S. § 9541 et seq.   On December 31, 1997 the Court of Common Pleas appointed counsel (William H. Hathaway) as Petitioner's state post-conviction counsel.

Following the submission of an amended post-conviction petition the trial court conducted an evidentiary hearing on August 5-6, 1998.  On September 16, 1998 the Court of Common Pleas denied Petitioner's post-conviction petition.

A timely Notice of Appeal was filed and Petitioner (still represented by Mr. Hathaway) filed an appellate brief with the Pennsylvania Supreme Court on December 13, 1998.   Following the Commonwealth's Answering Brief, Mr. Hathaway filed a reply brief on January 29, 1999.[1]

On August 6, 1999 undersigned counsel from the Capital Habeas Corpus Unit of the Federal Community Defender for the Eastern District of Pennsylvania filed in the Pennsylvania Supreme Court two documents:  a *Motion for Remand to the Court of Common Pleas to Vindicate Appellant's Right to Effective Assistance of Post-Conviction Counsel* (hereafter, Remand Motion), and *Appellant's Application Pursuant to Rule 2501(a) to File a Post-submission Communication*.  These pleadings set forth that undersigned counsel had developed important evidence regarding several claims for relief that were not previously presented to either the trial or post-conviction courts because of prior counsel's ineffectiveness.   In support of these assertions, undersigned counsel provided the Supreme Court with declarations from both trial counsel (Lucas) and post-conviction

---

[1]This recitation of the procedural history of the state post-conviction litigation and the litigation of the Atkins claim in the state courts and in this Court, is done with particular detail as these proceedings may have a bearing on the exhaustion and default status of some of Petitioner's guilt phase claims addressed herein. This point is addressed in detail below.

counsel (Hathaway) indicating that they were each ineffective for failing to litigate the claims contained in the *Remand Motion*

These documents were served upon Mr. Hathaway. The Supreme Court acknowledged receipt of these pleading by letter to the parties dated August 11, 1999 and invited an Answer from the Commonwealth, which was filed on August 19, 1999.

On February 22, 2000 the Pennsylvania Supreme Court issued its opinion denying Petitioner's post-conviction appeal. Marrero 2. This opinion did not address the issues raised in Petitioner's August 6, 1999 filings. Given the Supreme Court's failure to address these issues, at undersigned counsel request Mr. Hathaway filed two documents with the Pennsylvania Supreme Court: an *Application for Permission to Withdraw as Counsel*, and an *Application for Reargument*. In these documents, Mr. Hathaway argued that, although the issues set forth in the August 6 submission warranted relief, he was precluded under state law from litigating his own post-conviction ineffectiveness. Therefore, he asked to be formally relieved from his appointment and asked the Court to reconsider its prior ruling. On that same date, undersigned counsel also filed a pleading styled *Appellant's Motion for Reargument and Motion to Compel Decision*.

The Commonwealth responded to these pleadings in a letter dated March 16, 2000. The Commonwealth argued that all of the issues presented in the August 6 submissions were implicitly denied by the Supreme Court's February 22 decision.

By order of April 10, 2000 the Pennsylvania Supreme Court denied Petitioner's Remand Motion.

Meanwhile, on March 17, 2000 Pennsylvania Governor Thomas Ridge signed a death warrant directed at Petitioner. On April 11, 2000 Petitioner sought a stay of execution from this

3

Court pursuant to <u>McFarland v. Scott</u>, 512 U.S. 849 (1994) (document # 4).

On November 7, 2000 Petitioner filed the instant *Petition for Writ of Habeas Corpus and Consolidated Preliminary Memorandum of Law* (document # 7).

During the course of the litigation of the *Petition*, the United States Supreme Court decided <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), holding that the Eighth Amendment prohibited execution of persons with mental retardation.  On August 15, 2002 Petitioner filed a successive state post-conviction petition raising an <u>Atkins</u> claim in the Court of Common Pleas.

Since Petitioner had included a pre-<u>Atkins</u> claim in the *Petition* in this Court alleging that his execution would violate the Eighth Amendment because of his mental retardation, on October 1, 2002 the Magistrate-Judge, to whom the matter was referred, ordered the parties to brief the question of whether Petitioner's <u>Atkins</u> claim had been exhausted (document # 18).

Following submission of briefs on this question, the Magistrate-Judge issued a Report and Recommendation (R&R) recommending that the *Petition* be held in abeyance in order to permit Petitioner an opportunity to exhaust his <u>Atkins</u> claim in the state courts.  <u>See</u> R&R (document # 21) dated November 1, 2002.

Neither party objected to the R&R and on November 26, 2002 this Court adopted it, and ordered that the *Petition* be placed in abeyance pending exhaustion of state remedies (document # 22).

Petitioner's successive <u>Atkins</u> petition was denied by the Court of Common Pleas on November 18, 2002.  The Court found that the petition was untimely because it was filed more than one year after Petitioner's conviction became final, and it did not meet any of the exceptions to the PCRA's one year limitations period because the court did not deem <u>Atkins</u> to be retroactively

4

applicable.

Petitioner filed a timely notice of appeal to the Pennsylvania Supreme Court. On November 21, 2006 the Court issued an order remanding the matter to the Court of Common Pleas for a hearing to determine whether Petitioner is a person with mental retardation. Marrero 3.

As recounted in the recently filed *Motion to Reactive Habeas Corpus Proceedings for Review of Guilt Phase Claims and Request for Briefing Schedule*, since the case has been in the Court of Common Pleas Petitioner has prepared his Atkins-related proofs. Petitioner has had Mr. Marrero evaluated by a nueropsychologist, Dr. Gerald Cooke. Dr. Cooke has authored two reports finding that Mr. Marrero is a person with mental retardation (Dr. Cooke found that Mr. Marrero's IQ is 62, well within the range of mental retardation). Petitioner is prepared to present Dr. Cooke, and two other mental health professionals to opine that Petitioner is a person with mental retardation.[2]

The Commonwealth provided all of Petitioner's documentary exhibits and psychological and IQ testing to its expert, Michael Welner, M.D. Following Dr. Wellner's evaluation of these materials, the Commonwealth and Petitioner discussed resolution of Petitioner's capital litigation without the need for time consuming and expensive litigation. While Petitioner would be glad to see the death penalty removed as a punishment based upon a determination that he is a person with mental retardation, he has been unwilling to discontinue this habeas corpus litigation, which the Commonwealth has required as a condition for its agreement that Petitioner is entitled to Atkins relief.

_____

[2]Petitioner is prepared to offer the testimony of Julie Kessel, M.D., who evaluated Mr. Marrero for his earlier post-conviction litigation and Kate Erwin, M.D. Dr. Erwin treated Mr. Marrero for several years while she was employed by the Pennsylvania Department of Corrections. She authored many of the progress notes regarding Mr. Marrero's mental health impairments that were presented to the state courts and to this Court. See *Habeas Petition*, paragraph 3, pages 1-9.

According, Petitioner submits this *Memorandum of Law* addressing his entitlement to relief on each of the four guilt phase claims presented in the *Petition*.

### EACH OF THE GUILT PHASE CLAIMS ARE EXHAUSTED AND ARE NOT PROCEDURALLY DEFAULTED

The four guilt phase claims addressed herein are identified as follows in the *Petition*:

B.     Petitioner Was Denied His Rights under the Sixth, Eighth and Fourteenth Amendments When He Was Tried While Incompetent to Proceed.  The Trial Court Erred in Not Conducting Competency Proceedings and Trial Counsel Was Ineffective for Failing to Litigate Petitioner's Obvious Incompetence (hereafter, Claim B);

D.     Petitioner's First Degree Murder Conviction (And Resulting Death Sentence) Was Obtained in Violation Of His Sixth Amendment Right to Effective Counsel Because His Trial Attorney Failed to Investigate, Develop and Present a Diminished Capacity Defense At the Guilt Stage of Trial (hereafter, Claim D);

E.     Petitioner's Confessions Were Admitted at Trial in Violation of His Rights Secured by the Fifth, Sixth And Fourteenth Amendments to the United States Constitution, Because His Mental Retardation, Organic Brain Damage, Illiteracy and Other Mental Health Impairments Rendered Him Unable to Make a Knowing and Intelligent Waiver of His Miranda Rights and Any Such Purported Waiver of These Rights Was Involuntary. Trial Counsel Was Ineffective for Failing to Litigate this Claim (hereafter, Claim E); and

H.     Petitioner's Confession Was Obtained in Violation of the Fourth Amendment to the United States Constitution As it Was the Product of His Warrantless Arrest.  Trial Counsel Were All Ineffective for Failing to Litigate This Claim (hereafter, Claim H).

Each of these claims were presented in the Petitioner's Remand Motion (described above in the Procedural History.  In addition, claim B was also presented to the state courts in Petitioner's first PCRA petition.

The exhaustion requirement is codified at 28 U.S.C. § 2254(b)(1), which states that "[a]n application for a writ of habeas corpus ... shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State" or one of the statutory exceptions to exhaustion applies.

6

All that is required to exhaust a claim is that the litigant provide the state courts with **one** opportunity to pass upon the federal constitutional question. See Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991) (prisoner "exhausted his *Miranda* claim by presenting it on direct appeal, and was not required to go to state habeas at all"); Castille v. Peoples, 489 U.S. 346, 350 (1989) ("once the state courts have ruled upon a claim, it is not necessary for a petitioner to ask the state for collateral relief . . .") (citations and quotation marks omitted). Thus, once a habeas petitioner has exhausted a particular claim, there is no requirement that he provide the state courts any additional opportunity to pass upon the federal constitutional questions for which federal review is sought.

Petitioner provided the Pennsylvania state courts with an opportunity to pass upon each of the four claims addressed herein when he presented them each in his *Remand Motion* filed in the Pennsylvania Supreme Court. That Court denied the *Motion*. As a matter of state law, the denial of a motion for remand **constitutes denial of the merits of the claims contained therein.** Commonwealth v. Rompilla, 721 A.2d 786 (Pa. 1998). In Rompilla the appellant moved to remand from the Supreme Court to the Court of Common Pleas for an evidentiary hearing on newly discovered claims under Brady v. Maryland, 373 U.S. 83 (1963). The Court denied the remand motion. When the Brady claim was subsequently raised in Rompilla's appellate brief, the Pennsylvania Supreme Court refused to consider it, **because it was previously litigated on the merits by way of the remand motion**:

> Appellant next argues that this case should be remanded to the Court of Common Pleas for a hearing on recently discovered claims related to alleged violations of Brady v. Maryland, 373 U.S. 83 (1963). This issue has already been litigated. Appellant filed a remand motion in this Court on March 10, 1997 alleging the possibility of misconduct by the Federal Bureau of Investigation in the handling of evidence in this case. This Court entered an order denying the motion for remand on May 20, 1997. Appellant now summarizes his remand motion and offers no reason why this Court should reconsider its earlier ruling. No relief is due on this

7

<u>claim</u>.

<u>Rompilla</u>, 721 A.2d at 795.  Thus, under <u>Rompilla</u> a motion for remand serves to present the merits of, and therefore exhausts, the claims contained within it.[3]

In order to fulfill their duty of candor to the tribunal, counsel would point out that this Court has already rejected this exhaustion argument in this case.  Petitioner made this exact argument in his memorandum addressing the exhaustion of the <u>Atkins</u> claim.  The Magistrate-Judge rejected it, noting that presentation of claims in a motion to remand is not the "established" means for presentation of claims in Pennsylvania state court.  <u>See</u> R&R at 3, citing <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).

To be sure, Petitioner disagrees with this analysis.  State law, as articulated in <u>Rompilla</u>, holds that presentation of a claim in a motion to remand constitutes a ruling on the merits and therefore serves to exhaust the claim.  Nonetheless, Petitioner recognizes that the Magistrate-Judge's ruling, which this Court adopted without objection from Petitioner, constitutes the law of the case and thus may serve to preclude relitigation of this point at this time.

Should this Court holds that the three claims that were presented only in the *Remand Motion* are not exhausted, Petitioner would concede that there is no available means by which he can now raise the claims in the state court and that the claims would be procedurally barred from review in this Court.

---

[3]That the *Remand Motion* served to exhaust the four claims is further supported by a subsequent filing made by Respondents.  In their *Answer for Appellee* (filed August 19, 1999 by Respondents in response to the *Remand Motion*) Respondents clearly and repeatedly argued that there was "no merit" to the claims asserted in the *Remand Motion*.  Respondents argued that the record was already sufficient to rule on the merits of the claims presented (*Answer* at 1); and that the court was required to review the underlying "merits" of each of the claims presented (<u>id.</u>, at 2).

Regardless of the Court's ruling with respect to Claims D, E and H, Claim B was properly presented to the state courts in Petitioner's first PCRA petition and is therefore exhausted. See Marrero 2 at 204 (rejecting Petitioner's claim that he was incompetent at the time of the trial proceedings).

### ARGUMENT

**CLAIM B.    PETITIONER WAS DENIED HIS RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN HE WAS TRIED WHILE INCOMPETENT TO PROCEED. THE TRIAL COURT ERRED IN NOT CONDUCTING COMPETENCY PROCEEDINGS AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO LITIGATE PETITIONER'S OBVIOUS INCOMPETENCE.**

The Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); quoting, Medina v. California, 505 U.S. 437, 453 (1992); Drope v. Missouri, 420 U.S. 162, 171-172 (1975); Pate v. Robinson, 383 U.S. 375, 378 (1966). The prohibition against subjecting an incompetent person to criminal proceedings is a "fundamental component of our criminal justice system." Cooper, 517 U.S. at 364, n.20 (quoting United States v. Cronic, 466 U.S. 648, 653 (1984)). This fundamental principal of law was violated when Jose Marrero was tried while incompetent.

Because competence is so fundamental to a fair trial, due process requires that it be carefully guarded by adequate, reliable procedures: "failure to observe procedures adequate to protect a defendant's right to not be tried or convicted while incompetent ... deprives him of his due process right to a fair trial." Drope, 420 U.S. at 172; Pate, 383 U.S. at 378, 386. This right is so fundamental and important that it must be "protect[ed] even if the defendant has failed to make a timely request for a competency determination." Cooper, 517 U.S. at 354, n.4 (citing Pate, 383 U.S. at 384). The "trial court must always be alert to circumstances suggesting ... [that] the accused [is]

9

unable to meet the standards of competence to stand trial." Drope, 420 U.S. at 181. When there are indicia of incompetency that provide a "reason to doubt" the defendant's competency, the court must hold a competency hearing. Accord Pate, 383 U.S. at 385. If the trial court fails to hold such a hearing, the defendant is deprived of his right to a fair trial. E.g., Pate.

In safeguarding these rights, trial courts "rel[y] on counsel to bring these matters to [the court's] attention. ... If counsel fails ... to alert the court to the defendant's mental status the fault is unlikely to be made up." Bouchillon v. Collins, 907 F.2d 589, 597 (5th Cir. 1990). Accordingly, "counsel has a duty to investigate a client's competency" and is ineffective if he fails to do so. Agan v. Singletary, 12 F.3d 1012, 1018 (11th Cir. 1994); accord Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997); Bouchillon at 594-98; Futch v. Dugger, 874 F.2d 1483, 1486-87 (11th Cir. 1989); Roy v. State, 680 So.2d 936, 939 (Ala.Cr.App. 1996). Because incompetency is often "not visible to a layman," counsel's thorough investigation and consultation with mental health experts is often "the sole hope that it will be brought to the attention of the court." Bouchillon at 597.

Application of these principles to Petitioner's trial demonstrate that he is entitled to a new trial on a variety of grounds.

### 1.    Petitioner was Incompetent at the Time of Trial.

"The basic rule for competency to stand trial is that a defendant must (1) have 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2) possess 'a rational as well as factual understanding of the proceedings against him.'" Hull v. Kyler, 190 F.3d 88, 105 (3d Cir. 1999), quoting Dusky 362 U.S. at 402; citing Pate, 383 U.S. at 385. Petitioner's Department of Corrections records (excerpted in the *Petition* at pages 2-9) are littered with references to Petitioner's mental impairments that are hallmarks of incompetence: Petitioner's

inability to "remember" past events; that he is a "very poor historian;" that he could not relate the proper date when asked; that he is easily confused; that he hears voices which are hard for him to ignore; that he suffers from severe depression; that he has attempted suicide on several occasions; that he is psychotic; that he may suffer from Fetal Alcohol Syndrome; and that he suffers from paranoid schizophrenia; all relate to his inability to rationally understand the proceeding and to communicate and assist his attorney.

Moreover, these records – which by themselves demonstrate that Petitioner was tried while incompetent – demonstrate signs of incompetence as early as November, 3 1994, a mere 17 days after the commencement of Petitioner's trial on October 17, 1994, and only 9 days following the completion of his trial on October 25.  These records, therefore, provide virtually contemporaneous documentation of Petitioner's lack of capacity to proceed at trial.  See multiple entries dated November 3, 4, 15, 21, 23, & 24, 1994, excerpted in the Petition at pages 2-9.  The November entries are entirely consistent with the later notations contained in Petitioner's DOC records.

In addition to these contemporaneous records, Petitioner has been evaluated for post-conviction proceedings by two mental health professionals who were asked specifically to assess, among other issues, his trial competence.   Petitioner was evaluated by Julie Kessel, M.D.[4]  Dr. Kessel reviewed his history of abuse, deprivation, substance abuse and his many mental health deficits.  She concluded that based upon all of these factors, Jose Marrero was not competent to assist his attorney at the time of trial.  Dr. Kessel made specific note of Petitioner's inability to recall

---

[4]Dr. Kessel is a forensic and clinical psychiatrist.  Among other things, she has conducted forensic evaluations on behalf of the mental health unit of the Court of Common Pleas, Philadelphia County. She trained with Robert Sadoff, MD, and she is a contributing editor to the seminal work, KAPLAN & SADOCK'S COMPREHENSIVE TEXTBOOK ON PSYCHIATRY, Sixth Edition.

facts of his life in any helpful or specific detail.  Dr. Kessel's declaration setting forth her findings

and opinions was presented as an Exhibit to the *Petition*.  Dr. Kessel relates:

> I have conducted a forensic psychiatric evaluation of Jose Marrero.  I examined Mr.
> Marrero at the State Correctional Institution at Pittsburgh.  As part of my evaluation
> I reviewed transcripts of the guilt and penalty phases of his capital trial proceedings;
> court opinions; transcripts of his post-conviction proceedings; accounts of those who
> knew him as a child and young adult; his statements to the police, including a video-
> taped statement; and records revealing his history of mental illness, including DOC
> records.    I have also spoken with Dr. Alan Hopewell[5] concerning his
> neuropsychological testing of Mr. Marrero.
>
> Mr. Marrero is a seriously impaired individual.  He is mentally retarded and brain-
> damaged.  His recall of events and information such as where he lived, his family
> members, his friends, the circumstances surrounding the offense with which he was
> charged, and most of his life, is seriously deficient.  He is extremely childlike in his
> thinking and is unable to comprehend the legal concepts related to his incarceration.
> He has a history of psychosis including auditory hallucinations.  He has a history of
> self-mutilation.  All of these deficits and impairments are long-standing and were
> extant at the time of the offense.
>
> My evaluation and Dr. Hopewell's testing reveal that Mr. Marrero suffers from
> myriad significant mental health impairments.   He suffers from organic brain
> damage, major depressive disorder with psychotic features, substance-induced
> psychotic disorder with auditory hallucinations, polysubstance abuse disorder with
> episodic dyscontrol and a past history of dependence.  Mr. Marrero's brain damage
> can be traced to his childhood and may be congenital. He is mildly mentally retarded
> with an IQ in the mid-fifties.  His history is also consistent with the possibility of
> temporal lobe or other seizures.  An EEG could help to evaluate the presence of
> seizure disorder (although a negative EEG would not rule out seizure disorder).
> Additionally, Mr. Marrero was subjected to severe physical abuse and neglect as a
> child at the hands of his drug-dealing father, who kidnapped Mr. Marrero from his
> mother when he was an infant.  Mr. Marrero's father would beat him with his fists,
> belts, and belt buckles, on Mr. Marrero's back and head.  Mr. Marrero bears scars
> from such abuse on his back.  He also bears scars on his face, the result of being
> "pushed into a window" as a small child.  Mr. Marrero's traumatic childhood
> increased the likelihood that he would develop major mental illness, and exacerbated
> the behavioral impact of the above-described pathology.
>
> The neuropsychological assessment performed by Dr. Hopewell demonstrates that

---

[5]Dr. Hopewell's findings are presented below.

Mr. Marrero suffers from substantial neuro-cognitive deficits including those relative to his ability to learn, incorporate new information, reason, and recall information. Psychiatric records during periods of incarceration reveal that he is illiterate, mildly mentally retarded, suffers from auditory hallucinations and depression. This evidence is consistent with the presence of acquired organic deficits as well as congenital impairments. Mr. Marrero also reports a history of head trauma and loss of consciousness. These acquired deficits superimposed on Mr. Marrero's baseline cognitive impairments lead to an additional diagnosis of dementia.

Mr. Marrero was further impaired throughout his life and at the time of the offense by his severe drug and alcohol problems. Mr. Marrero was addicted to crack cocaine and alcohol. Additionally, he frequently inhaled gasoline until he was unconscious, which in and of itself can have tremendously damaging effects on the brain. It is not uncommon to see substance abuse problems in someone like Mr. Marrero, who has suffered from childhood trauma, depression, psychosis, and mental retardation. Substance abuse is a common way by which abused and mentally ill individuals like Mr. Marrero may attempt to numb the psychological pain resultant from their history of trauma, abuse and the frightening symptoms of their mental illness. While such substance abuse impairs the mental ability and functioning of even otherwise normal adults, in individuals like Mr. Marrero, it exacerbates his already existing mental impairments, negating any likelihood of appropriate functioning. Such abuse also severely impaired his judgment, insight and impulse control during his life and at the time of the offense.

The effects of the alcohol and drugs upon which Mr. Marrero was dependent at the time of the offense significantly aggravated his underlying psychosis, dementia, depression and mental retardation.

Each of Mr. Marrero's deficits (his organic brain damage, dementia, depression, psychosis, polysubstance abuse, gross intoxication and mental retardation) have an inter-related and adverse impact upon his cognitive, intellectual and emotional functioning and behavior and render him deeply disturbed and dysfunctional. . .

It is also my opinion that Mr. Marrero's brain damage, dementia, mental retardation, depression and substance-induced psychotic disorder rendered him wholly unable to rationally assist trial and appellate counsel, or to rationally make any of the decisions needed to stand trial and defend himself.

(Declaration of Julie Kessel, M.D., paragraphs 2-8, 11 (numbers deleted), attached as Exhibit to the

*Petition*).

Dr. Kessel relied, in part, on the psychological and neuropsychological testing and clinical

13

evaluation performed by Alan Hopewell, Ph.D, who is a certified and experienced forensic neuro-psychologist. His declaration was also presented as an Exhibit to the *Petition*.[6] Among other things, Dr. Hopewell has outlined Petitioner's history and deficits, and explains how they impaired Petitioner's ability to rationally understand the proceedings and to assist counsel:

> I have conducted a forensic psychological and neuropsychological evaluation of Jose Marrero. This evaluation consisted of the administration of a battery of neuropsychological and psychological tests. I reviewed numerous documents regarding Mr. Marrero, his background, his capital trial, sentencing, post-conviction proceedings, statements to the police in this matter, accounts of those who knew him as a child and young adult, and DOC records.

> Based on my review and analysis of all of this data, I have concluded that Mr. Marrero suffers from several organic impairments and mental deficits.

> Mr. Marrero lived with his father until running away and dropping out of school in the eighth grade. Mr. Marrero's father kidnaped him from his mother when he was an infant and proceeded to inflict clinically significant abuse upon him. Mr. Marrero's father was a drug dealer who was unemployed and supported himself and Mr. Marrero by his drug dealing.

> By all accounts, Mr. Marrero's father was extremely physically abusive towards Mr. Marrero. Mr. Marrero was consistently and extensively beaten with belts and belt buckles, and his father's fists. Mr. Marrero bears physical scars on his back from these beatings. Additionally, Mr. Marrero bears scars on his face. Mr. Marrero states that his father hit him in the head, but he did not go to the hospital.

> Aside from the physical abuse, Mr. Marrero was raised by his drug-dealing father in a grossly dysfunctional setting. Because of his father's marginal existence, Mr. Marrero's basic needs were often neglected. He wanted for food, clothing and shelter and at times, young Mr. Marrero lived on the streets.

> Mr. Marrero worked at a variety of unskilled jobs and became significantly dependent upon a variety of drugs himself. He admits to a history of alcohol and

---

[6]Dr. Hopewell is licensed to practice psychology in Louisiana, New Hampshire, North Carolina and Texas. He is certified by the American Board of Clinical Neuropsychology and is a Diplomate of the American Board of Professional Psychology. He has been retained and testified for both the prosecution and defense in criminal matters, and has also worked in civil cases.

"crack cocaine" dependence, with a binge pattern of staying up for 2 or 3 days smoking crack continuously until he would crash and then sleep for a day.  His history also suggests alcohol-induced pathological intoxication, i.e., that a small amount of alcohol would severely alter his personality.

Mr. Marrero's substance abuse included use of inhalants such as gasoline, which raises the question of additional acquired brain damage.  Mr. Marrero would huff gasoline until he lost consciousness.  Records reveal that Mr. Marrero has been suffering from auditory hallucinations for years, i.e., he hears the sound of children "crying", long before the offense in question.  Such hallucinations are common in those suffering from brain damage due to inhalant abuse.

Likewise, Mr. Marrero has a long history of major depressive episodes, which have caused him to attempt suicide on more than one occasion.  Mr. Marrero has been suffering from such depression for years, long before the offense in question.  DOC records also reveal that Mr. Marrero mutilated himself more recently on one occasion by stabbing his own wrist with a pen.

Mr. Marrero's history of child abuse and substance abuse are also significant because both of these factors have serious psychological and neuropsychological effects which interact with and are exacerbated by the already pronounced effects of Mr. Marrero's serious organic impairments.  Childhood abuse and neglect of the type Mr. Marrero suffered independently cause a variety of significant mental health impairments.  These deficits include problems in rational decision-making, impairments in recognizing consequences of behavior, difficulties in controlling emotions, difficulties in exercising proper judgment, a tendency to react to internal stimuli and perceptions (even when they do not correlate with reality or external stimuli), significant problems in self-esteem and the formation of an adequate and reality-based concept of self and others, with resulting paranoia.  Each of these deficits are exacerbated by his organic condition, which itself was at least partially caused by his history of physical abuse.

I administered a battery of neuropsychological tests to Mr. Marrero.  All testing results were valid.  Mr. Marrero put forward a good effort and he did not malinger as evidenced by his adequate performance in a number of areas.

Neuropsychological tests show severe deficits in his ability to complete even moderately complex tasks.  When he attempts to do so he becomes easily confused with subsequent frustration.  His short term memory is severely impaired, and he cannot store and recall recently learned information.  Because of this deficit, Mr. Marrero has severe difficulty in making use of recently stored information.  He tends to only remember the "last thing" that was told to him and to act upon that limited

15

memory. In addition, Mr. Marrero presents a number of intrusions as well as some neologisms. Intrusions are words which were never presented but which the client reports as being included in the memory probes.

Mr. Marrero's history and his presentation are also consistent with a seizure disorder. DOC records indicate that an EEG was ordered to be performed on Mr. Marrero, but no results of such EEG appear in his DOC records. A positive result on an EEG could definitely confirm a seizure disorder in Mr. Marrero. A negative EEG, however, would not rule out a seizure disorder.

His history, DOC records and my testing show Mr. Marrero to be severely limited intellectually. He is mildly mentally retarded with an IQ ranging in the mid-fifties. This places him in the first percentile of the population (i.e., 99% of the population have a higher cognitive function).

Mr. Marrero demonstrates extremely poor verbal skills and very low abilities in terms of language development, understanding verbal concepts, as well as a very rudimentary general fund of information. A restricted level of word knowledge which has been obtained both through academic training and life experiences is apparent. Mr. Marrero has difficulty with even basic communication skills. Common sense, judgment, and reasoning are very poorly developed, and Mr. Marrero demonstrates substantial difficulties with understanding cause and effect relationships and with inferential thinking.

Individuals like Mr. Marrero have a learning style in which they even have trouble with learning by practice and "hands-on" orientation, and reading and visualization is most likely not productive for them. However, such individuals will even have trouble being "followers" or learning by doing due to their intellectual limitations.

Mr. Marrero likely has substantial trouble even with the more routine and basic aspects of work due to his limitations. Such individuals are generally unable to "think for themselves," and may show an unacceptable lack of progression in terms of advancement and training beyond the entry levels of a program or profession, regardless of their levels of motivation. Individuals in this range of intellectual ability function best when they are seldom challenged mentally and when they work in routine and predictable environments. They tend to be unimaginative, but may even be poor followers due to their limitations.

The nonverbal skills relating to the ability of Mr. Marrero to reason what is happening in social situations, to solve problems by being able to analyze a situation and to describe it verbally, and to understand and verbally describe relationships in social situations is also felt to be severely restricted. Mr. Marrero is very concrete

16

and sees most situations in terms of being "black or white." Substantial difficulties in understanding complex situations or being able to see "shades of gray" are expected. Cognitively, Mr. Marrero has substantial difficulties in terms of frustration tolerance as well as marked restrictions in abilities to deal with complicated, stressful, complex, and ambiguous situations. These difficulties are likely to be so marked that poor or impulsive judgments are likely when faced with stress. Due to their cognitive limitations, many individuals with mental functioning at this level will demonstrate legal difficulties themselves.

The executive functioning of Mr. Marrero's brain is also affected by his intelligence being so low. Executive functioning is described as the ability to engage in independent, purposeful, self-directed and self-serving behavior. Disorders of executive function are generally manifested by emotional lability (extreme mood swings in which emotional actions are severely disrupted), irritability, rigidity, apathy, defective behavioral initiation, carelessness, poor judgment, and inappropriate social behavior. In Mr. Marrero's case, the problem can be described as a serious impairment in the starting, switching, and stopping of behavior as well as impairments in problem-solving, impairments in the ability to engage in abstract mental operations, defective mental flexibility, the loss of the ability to self-monitor for mistakes and show insight, and defects in sustained attention and mental persistence.

Due to Mr. Marrero's mental retardation, his inability to read and write, his total lack of memory recall, the presence of brain damage, his dementia, and his inability to understand even basic instructions such as the Miranda warnings, Mr. Marrero's ability to understand the nature of the charges and proceedings and to effectively and rationally assist in his defense is severely in question. His own trial attorney had great difficulty defending him because of his tenuous grasp of reality and his poor ability to cooperate rationally with trial counsel.

While Mr. Marrero may have the desire to cooperate with defense counsel, his ability to actually participate and cooperate is severely limited and mitigated by his brain damage, his mental retardation, and his dementia, which currently is controlled and managed only by incarceration and medication. Thus, not only was he not able to assist trial counsel, he was and is unable to assist all successor counsel as well.

Declaration of Alan Hopewell, Ph.D., paragraphs 2-9, 12, 15-22, 24, 34-35 (numbers deleted)

attached as an Exhibit to the *Petition*.

The record is indisputable: Petitioner has serious mental health impairments derived from

17

a variety of sources, that prevented him from understanding and assisting counsel. Petitioner is entitled to a hearing in order to prove to this Court that he was incompetent at the time of trial. <u>Hull v. Kyler</u>, 190 F.3d 88, 105 (3d Cir. 1999).

### 2.    Trial Counsel Was Ineffective For Failing to Request a Competency Evaluation and Hearing, and the Trial Court Erred in Not Providing Such a Hearing.

As noted above, because of the fundamental importance of competency to a defendant's right to a fair trial, counsel and the court must be particularly vigilant to a defendant's potential incompetence. <u>Hull</u>, 190 F.3d at 105-06 ("A defendent presenting similar evidence of incompetency would presumably be prejudiced by either the trial court's failure to grant a competency hearing or his counsel's failure to request one.").

The indicia of incompetency that were extant during Petitioner's trial were such that counsel should have requested a hearing and his failure to do so was ineffective. Counsel's representation of Petitioner was marked by what he perceived to be as Mr. Marrero's lack of cooperation. As trial counsel (Timothy Lucas) relates in his declaration, he complained repeatedly to the Court and to Petitioner that Mr. Marrero was not cooperative:

> My inability to communicate effectively with Mr. Marrero was a prominent feature of my representation. I recall that on several occasions during my post-conviction testimony, I recounted these problems for the trial court. For example, I told the Court:
>
>> [A]t some point in time I know that there were discussions that I had with him. And once I say discussions, these <u>were sort of one-way conversations</u> with me talking and him sitting. But the discussions were with him about the difficulty in obtaining any information about him and who he was.
>
> (NT 8/6/98, 72) (emphasis added). In regard to whether he should take the witness stand in his own defense, I again related to the Court that Mr. Marrero did not

18

actually participate in these "discussions":

> [T]o characterize these conversations as discussions is unfair, because often times they were not discussions, they were me talking and him sitting, listening, either responding in some very limited fashion or not responding at all.

(NT 8/6/98, 77). These communication difficulties significantly affected the advice I gave him regarding whether to testify. As I related at the post-conviction hearing:

> And the reason I did that [advise him not to testify] were multiple, not the least of which is up to that point <u>he never ever was able to provide any information</u> to me with regard to even easy questions, let alone hard questions that would be asked on cross examination.

The best he ever did with regard to the facts of the case is that he didn't know didn't remember. (NT 8/6/98, 78, 81) (emphasis added).

> These difficulties also affected my assessment of whether to have him evaluated by a mental health professional for penalty phase purposes. I contacted a psychologist, but an evaluation was never arranged. I did not arrange an actual evaluation or testing because of Mr. Marrero's inability to communicate (NT 10/17/94, 7). I was at a loss as to how to proceed, given Mr. Marrero's inability to communicate. **I should have insisted on an evaluation and hearing to determine whether he was competent and whether there was a mental health-related cause for his communication problems.**

(Declaration of Timothy Lucas, Esq., paragraphs 3-4 (numbers deleted) attached to *Petition*).

Despite his complaints, trial counsel was not able to state whether Petitioner was "unwilling" or "unable" to cooperate (NT 10/17/94, 7). Despite uncertainty on this critical issue, counsel never took any steps to determine the answer to this fundamental question. Even if Lucas believed that Petitioner's lack of cooperation was volitional, it is well-established that a lawyer cannot rely on his own observations in assessing whether a client is competent. When there are apparent indicia of incompetency (as in this case) the Third Circuit has aptly explained, a competency evaluation by a mental health expert is necessary because "[f]ew lawyers possess even a rudimentary understanding

of psychiatry ... [and] therefore are wholly unqualified to judge the competency of their clients."

Hull v. Freeman, 932 F.2d 159, 168 (3d Cir. 1991).  In short, there must be a valid and reliable

determination of competency.  None occurred in this case despite the presence of significant indicia

because counsel was ineffective – as he candidly admits ("I should have insisted on an evaluation

and hearing to determine whether he was competent and whether there was a mental health-related

cause for his communication problems.").

 Trial counsel admits that he should have had Petitioner evaluated by a mental health

professional, such as Dr. Hopewell, whose report he has reviewed.  Mr. Lucas further admits that

Dr. Hopewell's conclusions "provide a cogent explanation for Mr. Marrero's difficulties:

> I have recently been provided with an affidavit signed by C. Alan Hopewell, Ph.D.,
> a clinical and forensic psychologist.
>
> Dr. Hopewell's conclusions provide a cogent explanation for Mr. Marrero's
> difficulties.  Dr. Hopewell's findings put Mr. Marrero's communication difficulties
> into context and are entirely consistent with the behaviors that I observed.  Mr.
> Marrero's difficulties, according to Dr. Hopewell, are the result of his organic
> deficits, mental retardation, dementia, psychosis, and hallucinations, all of which
> impaired his ability to recall remote and recent events, his ability to understand and
> figure things out, and to communicate with me in a meaningful way.  Thus, for
> example, the doctor's conclusions explain the one-sided discussions referenced in
> my post-conviction testimony.  Similarly, Mr. Marrero's inattention or "spacing out"
> during our discussions are entirely consistent with his mental problems.  Further,
> from my experience I understand that major depression can cause a person to "shut
> down" or not participate, as was the situation with Mr. Marrero during the time of my
> representation.  Dr. Hopewell has found him to be a person with a history of serious
> depression.  The diagnosis of depression explains Mr. Marrero's inability to
> communicate with me.  Such major depression is also consistent with and
> accompanied by suicide attempts.  Thus, this diagnoses is also consistent with Mr.
> Marrero's repeated statements to me that he just wanted to die.  I should have
> pursued an evaluation and competency assessment.
>
> It is clear to me that Mr. Marrero did not choose not to cooperate, he simply was not
> able to cooperate. [Emphasis in original]  I recall that I considered whether drugs and

20

> alcohol may have been the cause of his non-communication. However, I never
> considered that Mr. Marrero was mentally retarded, brain-damaged, demented,
> psychotic or severely depressed. Although it was certainly my job as counsel to
> understand that my client operated with these deficits, I simply failed to identify or
> appreciate them. Therefore I did not know that I was dealing with a severely
> impaired individual. I had no tactic or strategy for failing to consider the presence
> of absence of these deficits.

(Declaration of Timothy Lucas, Esq., paragraphs 9-11 (numbers deleted)).

It was inexcusable that trial counsel failed to appreciate that he was representing a very ill

man. Records from the Erie County Jail (which existed at the time of Petitioner's trial and pre-trial)

show indisputably that Petitioner was quite ill. On February 4, 1994, just 10 months prior to his trial,

Mr. Marrero attempted to commit suicide in his cell at Erie County prison. Records from the

County Prison indicate bizarre behavior:

> At approximately 8:15 PM the night of 2-4-94 Officers Davis and Masler were
> conducting a routine tour of ISO#2 where inmate Marrero is presently housed. Davis
> and Masler observed standing in the ISO with a makeshift noose tied around his
> neck, apparently looking for a place to attach it. Officer Davis ordered Marrero to
> sit on the bunk, Marrero did so. Davis and Masler then removed the noose. Marrero
> was then strip-searched, the cell was checked for contraband, at this point this writer
> did order the officers to place Marrero in restraints because of his bizarre behavior
> and for his own protection.

Clearly, Mr. Marrero's suicidal ideation constituted abundant "reason to doubt" his trial competency.

See Drope, 420 U.S. at 179 (suicide attempts recognized as an indicia of incompetency that ought

be explored).

Suicidal ideation was not the only indicia of incompetency demonstrated by Mr. Marrero at

and around the time of his capital trial. The same day he attempted suicide in Erie County Prison,

records indicate that he was seen "banging his head on the wall and door. Inmate Marrero was also

eating his mattress." On February 13, 1994, records reveal Petitioner engaged in self-mutilation:

21

1:00 AM.  On above date and approximate time this writing officer (Martin) noticed upon checking ISO#2 (Marrero Jose) that he was making marks on the inside of his right arm (from wrist to elbow) with what appeared to be a piece of paper.  Marrero had the piece of paper folded up to a point and was leaving red marks on his arm.  This officer asked Marrero what he was doing.  Inmate Marrero first gave me a "blank stare", and did not respond with a verbal answer.

1:10 AM.  . . .Jose Marrero was scratching his arm with something.  officer Kendziora and myself entered the unit to check on inmate Marrero.  After a strip search of the inmate, we noticed scratches on his left arm.  We notified the nursing staff.  Carolyn came up to the 5th floor to examine Inmate Marrero.  She offered to put some ointment on his arm but inmate Marrero refused treatment.  We conducted a shakedown of the unit.  We found a broken toothbrush on the sink, we believe that this is what inmate Marrero used to mark his arm.

2:35 AM.  Sgt. Loomis came up to the 5th floor and went to ISO #2 to survey the situation.  Sgt. Loomis observed the inmate standing by the sink.  When asked what he [was] doing there was no response.  Sgt. Loomis entered the unit and instructed inmate Marrero to lie down on his bunk and behave.  After leaving ISO#2 a chair was placed outside the unit so inmate Marrero's activity could be monitored closely for duration of shift.

IMMEDIATE ACTION TAKEN AND REASON.  ISO#2 checked every 10 minutes for anymore strange behavior.

Clearly, this conduct should have raised substantial doubt about Mr. Marrero's mental health and his competency to stand trial.

Trial counsel clearly had a duty to obtain these records.  E.g., Rompilla v. Beard, 545 U.S. 374 (2005) (capital counsel have duty to examine public records containing important information); Wiggins v. Smith, 539 U.S. 510 (2003) (same); Terry Williams v. Taylor, 529 U.S. 362, 396 (2000) (capital counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background" and their performance "fell short of professional standards" when they failed to seek and obtain documentary records about the client); Michael Williams v. Taylor, 529 U.S. 420, 439 (2000) ("a diligent attorney" would have sought out mental health reports that

were of "potential importance").

Here, counsel failed to secure a basic record relating to Petitioner's incarceration. Such records are routinely obtained in capital litigation, because, if nothing else, a positive adjustment to pre-trial incarceration is mitigating. Skipper v. South Carolina, 476 U.S. 1 (1986). Had counsel obtained this fundamental record, he would have seen that his client was acting very strangely (to say the least). A mental health evaluation under those circumstances would have been required.

In a similar vein, the trial court was also required to conduct a competency proceeding because it was aware of indicia of incompetence. Counsel's advisement to the Court that Mr. Marrero was not consulting with him about a number of trial issues, should have raised a red-flag with the Court, since ability to consult and cooperate with counsel constitutes one of the two elements regarding competence. See Hull v. Kyler, 190 F.3d 88, 105 (3d Cir. 1999) (defendant must possess "sufficient present ability to consult with his lawyer"). The Court, as did counsel, simply failed to consider whether the inability to communicate was due to a mental impairments, as opposed to being the product of volition.

### 3. The Supreme Court's Opinion on this Issue is Contrary To and an Unreasonable Application of 28 U.S.C. § 2254.

Petitioner's substantive competency claim and the related claim of ineffectiveness of counsel were presented to the trial court and the Pennsylvania Supreme Court. See Copy of *Brief of Appellant* submitted on post-conviction appeal to the Pennsylvania Supreme Court. Marrero 2 at 203-04.[7] The trial court did not address either aspect of the competency claim presented in post-

---

[7]The Pennsylvania Supreme Court's opinion mixes up the numbering of this claim. Initially, it noted that competency was raised as Claim 1, and it identified Claim 3 as related to ineffectiveness in the penalty hearing. Marrero 2 at 203. However, in addressing the claims, it referred to the

conviction.  The Supreme Court denied relief on this claim in one short paragraph:

> Appellant asserts in claim 3 that trial counsel failed to inquire into Appellant's competence by not seeking psychological and/or intelligence evaluations of Appellant.  The record reveals that trial counsel did in fact motion the trial court for the appointment of a forensic toxicologist, psychiatrist and psychologist, to examine Appellant.  However, attempts at securing expert evaluations of Appellant were precluded by Appellant's refusal to cooperate with trial counsel or assist in his own defense.

Marrero 2 at 204.

The Pennsylvania Supreme Court's treatment of this claim is contrary to and an unreasonable application of AEDPA's section 2254 (d).  As described above, when a defendant does not cooperate with counsel or the court, a determination must be made as to whether the lack of cooperation is volitional or the result of incapacity.  Where there are indications of incompetency, a defendant has a procedural due process right to a hearing on competence.  Pate v. Robinson, 383 U.S. 375 (1966).  Neither the trial court nor the appellate court complied with Pate when it found that Petitioner's lack of cooperation was volitional without a hearing.  Moreover, the Court did not address the related claim of trial counsel's ineffective failure to present the indicia of incompetence to the Court or to request a hearing.  When counsel ineffectively fails to enforce a defendant's rights under Drope and Pate, such counsel violate the Sixth Amendment.  See e.g. Appel v. Horn, 250 F.3d 203, 215-216 (3d Cir. 2001) (counsel have Sixth Amendment imposed obligation to subject competency question to full "adversarial testing").

Here, the Pennsylvania Supreme Court did not address the core question with any degree of

---

competency claim as Claim 3, and the penalty claim as Claim 1.

A review of the trial court opinion reveals that it did not address the competency claim, which is consistent with the Supreme Court's notation that the competency claim was "summarily dismissed" Marrero 2 at 202-04.

care. It appears to have assumed the answer to the central question: why was Petitioner not cooperative. This is contrary to the above described precedents and the state court opinion is owed no deference.[8]

**CLAIM D.** **PETITIONER'S FIRST DEGREE MURDER CONVICTION (AND RESULTING DEATH SENTENCE) WAS OBTAINED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL BECAUSE HIS TRIAL ATTORNEY FAILED TO INVESTIGATE, DEVELOP AND PRESENT A DIMINISHED CAPACITY DEFENSE AT THE GUILT STAGE OF TRIAL.**

Trial counsel was ineffective at the guilt phase because he failed to reasonably investigate, develop and present crucial mental health evidence that would have provided the necessary foundation for a diminished capacity defense. Additionally, such mental health evidence would have provided the necessary foundation for the voluntary intoxication defense trial counsel half-heartedly presented. As set forth throughout the *Petition*, Mr. Marrero's mental illness and cognitive impairments impact upon his behavior and prevented him from formulating a specific intent to kill.

Pennsylvania law recognizes that a "in asserting a diminished capacity defense, a defendant is attempting to prove that he was incapable of forming the specific intent to kill ...." Commonwealth v. Legg, 711 A.2d 430, 433-34 (Pa. 1998). This defense, in turn, reduces first degree murder to third degree murder. Id. Moreover, state law permits expert mental health testimony in support of a diminished capacity defense when "it speaks to mental disorders affecting the cognitive functions necessary to formulate a specific intent" to kill. Commonwealth v. Weinstein, 451 A.2d 1344, 1347 (Pa. 1982); accord Legg, 711 A.2d at 433; Commonwealth v.

---

[8]Petitioner is entitled to and requests an evidentiary hearing on this claim. He has pled facts which would entitle him to relief, and therefore the Court is obliged to permit him evidentiary development of them.

25

Anderson, 600 A.2d 577 (Pa.Super. 1991) ("The Pennsylvania Supreme Court has consistently held that expert psychiatric testimony is admissible to negate the specific intent to kill which is essential to first degree murder" (citing Weinstein; Commonwealth v. Terry, 521 A.2d 398 (Pa. 1987); Commonwealth v. Garcia, 479 A.2d 473 (Pa. 1984); Commonwealth v. Walzack, 360 A.2d 914 (Pa. 1976)).

The proffered mental health facts in this case, including expert opinions, trial counsel's declaration, and the accounts of lay witnesses all show that Petitioner could have presented viable diminished capacity and voluntary intoxication defenses, but did not because of trial counsel's ineffectiveness.  See *Petition* at Claims B-D for proffers regarding mental health evidence relevant to diminished capacity.

The accounts of those who knew Petitioner set the stage for the diminished capacity defense by describing his deprived and traumatic childhood in the home of a violent, frightening father; his lifelong history of learning problems, cognitive dysfunction, emotional instability and mental illness; the stressful, chaotic and frightening events leading up to the time of the offense; and the adverse effects of such stress and confusion on Petitioner's mental state.

The proffered expert mental health evidence is of the type that the Pennsylvania courts have long held admissible to establish a diminished capacity defense.  Both Dr. Hopewell and Dr. Kessel opined that Petitioner suffers from organic brain damage, dementia, psychosis, and severe depression -- that result in substantial impairments that left Mr. Marrero utterly cognitively dysfunctional and established the diminished capacity defense as defined by Pennsylvania law.

Additionally, the lay affidavits contain crucial information setting forth details of drastic

26

changes in Mr. Marrero's personality after the consumption of the slightest amount of alcohol. This information sheds light on yet another mental impairment in Mr. Marrero: his pathological intoxication. In fact, Dr. Hopewell's report confirms the existence of this condition. Thus, had trial counsel pursued a diminished capacity/voluntary intoxication defense, he would have discovered and used this highly relevant evidence.

It is clear that counsel had no reasonable justification for failing to pursue this defense. Indeed, he presented a half-baked version of it without any of the supporting facts and expert opinions that were available. Counsel has admitted his shortcomings in this regard:

> [I]n an effort to avoid a first degree murder conviction and the death penalty, I presented a diminished capacity defense in the guilt and penalty phases based upon Mr. Marrero's alcohol use. I did not think that these presentations were particularly strong, but I considered them to be the best defenses that I could assert. Had I known about Mr. Marrero's mental health deficits, I would have incorporated his mental problems into my diminished capacity presentations at both phases of the trial and they would have added significant strength to both aspects of our case. According to Dr. Hopewell, Mr. Marrero was not capable of forming the specific intent to kill and therefore his findings would have supported these defenses and possibly other lesser offenses.

(Lucas Declaration at ¶ 16).

The right to the effective assistance of counsel includes the right to have counsel investigate and produce evidence in support of any viable defense. Strickland v. Washington, 466 U.S. 668, 690-91 (1984); United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989). Counsel must make a reasonable effort to contact known witnesses and attempt to obtain available evidence which both diminishes the Commonwealth's case and/or supports the defense. Gray, 878 F.2d at 711. Counsel's duty is to make an independent investigation of the facts and circumstances. Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985). Where counsel fails to investigate and explore the

defense, he has no reason to discount the worth of the defense, and his inaction constitutes negligence, not strategy.  Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir. 1992). This duty to investigate is especially exacting in a capital case, where "counsel's duty to investigate all reasonable lines of defense is strictly observed."  Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997). United States v. Kauffman, 109 F.3d 186 (3d Cir. 1997); United States v. Bayne, 622 F.2d 66, 69 (3d Cir. 1980) ("failure to investigate a critical source of potentially exculpatory evidence" cannot be characterized as "strategy"); Jackson v. Herring, 42 F.3d 1350, 1350 (11th Cir. 1995) ("case law rejects the notion that a 'strategic' decision can be reasonably made when the attorney has failed to investigate his options and make a reasonable choice between them").

**The Application of AEDPA.**

As acknowledged above in the section addressing exhaustion and default, this claim was presented to the state courts only in the *Motion to Remand*.  Should the Court find that to be a proper method for exhaustion, then this claim can be reviewed.  In that case, there is no state court opinion to defer to, as the Pennsylvania Supreme Court simply "denied" the claim without discussion.

Conversely, if this Court finds that presentation in the *Motion to Remand* did not exhaust this claim, then Petitioner concedes there is no available remedy upon which he can obtain state court review and this claim would be procedurally defaulted.

**CLAIM E.**    **PETITIONER'S CONFESSIONS WERE ADMITTED AT TRIAL IN VIOLATION OF HIS RIGHTS SECURED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, BECAUSE HIS MULTIPLE MENTAL HEALTH DEFICITS RENDERED HIM UNABLE TO MAKE A KNOWING AND INTELLIGENT WAIVER OF HIS MIRANDA RIGHTS AND ANY SUCH PURPORTED WAIVER OF THESE RIGHTS WAS INVOLUNTARY. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO LITIGATE THIS CLAIM.**

Following Petitioner's arrest in Cleveland, Ohio he was interrogated by Erie, Pennsylvania detectives. He subsequently "gave" a videotaped confession, which was admitted as evidence at trial. Marrero, 687 A.2d 1106.

As described throughout the *Petition*, Mr. Marrero is and was a profoundly mentally ill and severely brain damaged. Mr. Marrero's mental health impairments rendered him unable to waive his Fifth Amendment rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). The introduction of his confession therefore, violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Hence, Mr. Marrero's conviction and sentence are invalid and should be vacated.

A statement made by a criminal defendant during custodial interrogation cannot be introduced against him at trial unless it was made voluntarily and after a knowing and intelligent waiver of the Fifth Amendment rights to remain silent and to consult with an attorney prior to speaking with the police. Miranda, 384 U.S. at 444. In evaluating whether there has been a valid waiver of these rights, the court must determine whether the defendant's decision was "voluntary in the sense that it was the product of a free choice rather than intimidation, coercion or deception" and whether the waiver was made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412,

421 (1986). Specifically, the court is to consider whether "the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." Id. The ultimate burden is on the state to prove, by a preponderance of the evidence, that the defendant did knowingly, intelligently and voluntarily waive his Miranda rights. Lego v. Twomey, 404 U.S. 477 (1972).

Because of the "fundamental concern [about a] mentally deficient accused's vulnerability to suggestion," mental illness and educational deprivations are both factors that must be considered when evaluating the validity of such a waiver.  Henry v. Dees, 658 F.2d 406, 409 (5th Cir. 1981); accord Schneckloth v. Bustamonte, 412 U.S. 218 (1973); Clewis v. Texas, 386 U.S. 707 (1967); Davis v. North Carolina, 384 U.S. 737 (1966); Williamson v. Reynolds, 904 F. Supp. 1529, 1544-45 (E.D. Okla. 1995), aff'd, Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997); Moore v. Ballone, 658 F.2d 218, 228-30 (4th Cir. 1981); Miller v. Dugger, 383 F.2d 1530, 1539 (11th Cir. 1988); Cooper v. Griffin, 455 F.2d 1142, 1145 (5th Cir. 1972); United States v. McClure, 786 F.2d 1286, 1289 (5th Cir. 1986).  Likewise, low intelligence and "illiteracy ha[ve] also been regarded as an additional factor to be considered" in making such an assessment.  Northern Mariana Islands v. Mendiola, 976 F.2d 475, 485 (9th Cir. 1992) (citing Reck v. Pate, 367 U.S. 433, 441 (1961); Payne v. Arkansas, 356 U.S. 560, 562 (1958)).  As the Fifth Circuit has explained:

> [W]hen persons of markedly limited mental ability ... are questioned without the aid of counsel, issues 'of suggestibility and possible overreaching are raised ... and must be factored into a consideration of the totality of the circumstances.'  Extra precautions must be taken.  It must be painstakingly determined that they comprehend what events are transpiring.  In addition, the presence of counsel should be assured absent an unmistakable, knowing waiver of that assistance.

Henry, 658 F.2d at 411 (quoting Jurek v. Estelle, 623 F.2d 929, 938 (5th Cir. 1980)).

In this case, Mr. Marrero did not make a knowing, voluntary and intelligent waiver of his

Fifth Amendment rights. Because of his numerous mental health deficiencies, he was simply unable

to do so. As Dr. Hopewell, who reviewed Mr. Marrero's videotaped statement, notes:

> Mr. Marrero was incompetent to waive his Miranda rights due to his mental retardation, his inability to read and write, his presence of brain damage, and his dementia. Similarly, Mr. Marrero's brain damage is such that he has absolutely no memory recall whatsoever, even concerning the most basic events. The impact of his various deficits on his ability to make a knowing and intelligent waiver of his Miranda rights or to provide a truthful and accurate confession can be seen on the video tape of his ostensible confession. For example, his failure to recall rote events (e.g., when he was last in Erie, or what time of year it was at the time of the statement) stands in contrast to his apparent recall of the "facts" of the offense. This coupled with his tendency to confabulate -- a common symptom of brain damage -- calls into question the accuracy and validity of the confession. Similarly, as noted above, Mr. Marrero's overall cognitive deficiencies rendered him clinically incapable of understanding and surrendering his legal right to remain silent or to engage counsel.
>
> Testing indicates that Mr. Marrero has an essentially minimal understanding of his Miranda rights, even with repeated questioning and cuing. For example, Mr. Marrero's response to "What is an attorney?" was "It is a vocation." Scoring to determine Mr. Marrero's abilities to understand Miranda warnings reflect that his level of comprehension is far below those of other individuals tested, the result of the additional effects of Mr. Marrero's brain damage. Indeed, Mr. Marrero's level of functioning is seen to be equivalent to that of a ten year old child with an IQ in the mentally retarded range.
>
> It is my professional opinion that Jose Marrero could not voluntarily, knowingly or intelligently waive his rights in response to a Miranda warning as a result of a functional level of mental retardation, his illiteracy, and his organic brain damage. Mr. Marrero is incapable of understanding the consequences of waiving his Miranda rights.

(Hopewell Declaration at ¶¶ 10-11).

Dr. Kessel, M.D., also evaluated whether Petitioner could understand and waive his Fifth

Amendment rights. Dr. Kessel agrees with Dr. Hopewell's assessment of Mr. Marrero's mental state

31

at the time of his statement to police.  She states:

> [I]t is my opinion that Mr. Marrero was not able to waive and understand his Miranda rights.  Given his brain damage, dementia, mental retardation and substance-induced psychotic disorder, his "confession" could not have been given knowingly, voluntarily or intelligently.

(Declaration of Dr. Kessel at ¶ 4).

Finally, even trial counsel concedes that had he known of the nature of Mr. Marrero's deficiencies, he "would have litigated the voluntariness of Mr. Marrero's confession on the ground that he could not understand or intelligently waive his Miranda rights."  (Declaration of Lucas, at ¶ 15).

Hence, there is and was significant additional evidence of Mr. Marrero's impaired mental health and his inability to make a knowing, voluntary and intelligent waiver of his Fifth Amendment rights.  As discussed throughout the *Petition*, due to trial counsel's ineffective failure to properly investigate, develop and present the available evidence about Mr. Marrero's mental illness and traumatic upbringing, no mental health expert ever evaluated Mr. Marrero to determine the nature and extent of his mental deficits.

Due to trial counsel's ineffectiveness, neither the court nor jury heard about the full extent of Mr. Marrero's substantial mental health and cognitive impairments.  Due to trial counsel's ineffectiveness, the trial court also never heard about the devastating effect that Mr. Marrero's organic brain damage had on his ability to comprehend his constitutional rights and Miranda warnings.

Mr. Marrero was constitutionally unable to waive his Fifth Amendment rights.  His statement to the police was involuntary.  His rights under the Fifth, Sixth, Eighth and Fourteenth Amendments

to the United States Constitution were violated.

**The Application of AEDPA.**

As acknowledged above in the section addressing exhaustion and default, this claim was presented to the state courts only in the *Motion to Remand*. Should the Court find that to be a proper method for exhaustion, then this claim can be reviewed. In that case, there is no state court opinion to defer to, as the Pennsylvania Supreme Court simply "denied" the claim without discussion.

Conversely, if this Court finds that presentation in the *Motion to Remand* did not exhaust this claim, then Petitioner concedes there is no available remedy upon which he can obtain state court review and this claim would be procedurally defaulted.

**CLAIM H.**  **PETITIONER'S CONFESSION WAS OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS IT WAS THE PRODUCT OF HIS WARRANTLESS ARREST. TRIAL COUNSEL WERE ALL INEFFECTIVE FOR FAILING TO LITIGATE THIS CLAIM.**

Petitioner was formally arrested at 9:20 p.m. on January 26, 1994 by the Cleveland police on charges of receiving stolen property. Upon arrival of the Erie investigators at 3:00 a.m. on January 27, 1994, Petitioner was interrogated and confessed to the killing. Marrero, 687 A.2d at 1106.

Trial counsel moved to suppress these confession on the ground that it was obtained in violation of Pennsylvania's "six-hour" rule and that the police did not respect Petitioner's invocation of his right to remain silent. Marrero 1 at 1105-06. Trial counsel, however, failed to litigate the claim that Mr. Marrero was arrested in a residence without an arrest warrant.

Absent exigent circumstances – which are not present in this case – a person may not be arrested in their residence without the police obtaining an arrest warrant. Payton v. New York, 445

33

U.S. 573 (1980); Commonwealth v. Williams, 396 A.2d 1177 (Pa. 1978). Here, the pre-trial

testimony shows that Petitioner was arrested while he was present in a residence where he was

spending at least the night of his arrest. This is shown in the pre-trial testimony of the arresting

officer:

> Question:    And it was the defendant then you're saying who answered the door?
>
> Answer:    Correct.
>
> Question:    Did he live there at that address?
>
> Answer:    He was spending the night there.
>
> Question:    Did he have belongings there?
>
> Answer:    He had some boxes of property.

(NT 6/1/94, 71). Moreover, a police report authored by Cleveland Police Officer Harper, indicated

that Petitioner was arrested in his uncle's home (a copy of the report was included as an Exhibit to

the *Petition*).

Since Petitioner was arrested in a place in which he was "spending the night," and in which

he maintained his property, he had an expectation of privacy recognized by the Fourth Amendment

to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. Stoner

v. California, 376 U.S. 483 (1964) (expectation of privacy in a hotel room); Commonwealth v.

Labron, 669 A.2d 917, 921 (Pa. 1995) (finding an expectation of privacy with respect to one's

office"); Commonwealth v. Brundidge, 620 A.2d 1115, 1118 n. 3 (Pa. 1993) ("Fourth Amendment

protection extends to a hotel room . . . occupied, in much the same way as it does to a citizen's home

or office.").

Here, according to the police reports and pre-trial testimony, Petitioner was arrested while staying with his uncle in his residence.  He had an expectation of privacy as strong as an occupant of one's own home, hotel or office.  Since Petitioner's confession was the product of his warrantless and therefore illegal arrest, the confession should have been suppressed as the fruit of that illegality. Dunaway v. New York, 442 U.S. 200 (1979).

Counsel was ineffective for failing to litigate this claim at trial and on direct appeal.

**The Application of AEDPA.**

As acknowledged above in the section addressing exhaustion and default, this claim was presented to the state courts only in the *Motion to Remand*.  Should the Court find that to be a proper method for exhaustion, then this claim can be reviewed.  In that case, there is no state court opinion to defer to, as the Pennsylvania Supreme Court simply "denied" the claim without discussion.

Conversely, if this Court finds that presentation in the *Motion to Remand* did not exhaust this claim, then Petitioner concedes there is no available remedy upon which he can obtain state court review and this claim would be procedurally defaulted.

**CONCLUSION**

For all of the above reasons, those contained in the *Petition* and all other submission made to the Court and based upon the full record of proceedings in the state courts, Petitioner requests that the Court grant the Writ of Habeas Corpus as to each of the above claims for relief.  Alternatively, Petitioner requests that the Court afford him an evidentiary hearing at which he can prove the facts entitling him to relief.

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman
Shawn Nolan
James McHugh
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Dated: Philadelphia, PA
        December 4, 2007

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, hereby certify that on this 4th day of December, 2007 I served the foregoing upon the following person in the manner indicated by United States Mail, First Class, Postage Prepaid:

Honorable Bradley H. Foulk
District Attorney
ADA Doug McCormick
Erie County District Attorney's Office
Erie County Courthouse
Erie, PA 16501

/s/ Michael Wiseman

_____

Michael Wiseman