## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSE ANTONIO MARRERO,
    Petitioner

    v.

MARTIN HORN, et al.,
    Respondents

Civil Action No. 00-2155
Chief Judge Donetta W. Ambrose

## OPINION
## AND ORDER OF COURT

### Ambrose, Chief District Court Judge:

In 1994, a jury empaneled by the Court of Common Pleas of Erie County, Pennsylvania,

convicted Petitioner, Jose Marrero, of first degree murder in the death of Elizabeth Smith. The jury

also convicted him of burglary, theft by unlawful taking, and possessing instruments of a crime.

Following a separate penalty hearing, Marrero was sentenced to death on his first degree murder

conviction.

Marrero filed with this Court a petition for habeas corpus relief under 28 U.S.C. § 2254, in

which he has raised nine claims, identified as Claim A through Claim I. (*Petition*, Doc. No. 7). Four

of Marrero's claims would, if granted, require a new trial. Those guilt phase claims are:

**Claim B:**    He was denied his Sixth and Fourteenth Amendment rights because he was tried while he was incompetent, his trial counsel was ineffective with respect to investigating and raising an issue of his incompetence, and the trial court should have conducted a competency hearing prior to his trial.

**Claim D:**    His first degree murder conviction was obtained in violation of his Sixth Amendment right to effective counsel because his trial attorney failed to investigate, develop, and present a diminished capacity defense at the guilt phase of his trial.

**Claim E:**    His confessions were admitted at trial in violation of his rights secured by the Fifth, Sixth, and Fourteenth Amendments, because his mental impairments and illiteracy rendered him unable to make a knowing and intelligent waiver of his Miranda rights

-1-

and any such purported waiver of these rights was involuntary; and, trial counsel was ineffective for failing to litigate this claim.

**Claim H**: His confession was obtained in violation of the Fourth Amendment as it was the product of his warrantless arrest; and, trial counsel was ineffective for failing to litigate this claim.

Marrero also contended that if this Court determined that he is not entitled to a new trial as to his guilt, it should at least grant him a new sentencing hearing. In support, he raised numerous sentencing phase claims. In one of those claims – **Claim I** – he contended that he is mentally retarded and that his death sentence should be vacated because his execution would constitute cruel and unusual punishment in violation of the Eighth Amendment.

After this proceeding commenced, the United States Supreme Court issued a decision relevant to Claim I – Atkins v. Virginia, 536 U.S. 304 (2002). That decision prohibits the execution of persons with mental retardation. After Atkins was decided, I stayed this proceeding because Marrero was simultaneously litigating an Atkins claim in the state court. In 2007, I lifted the stay at the request of the parties. They are still litigating the Atkins claim in the state court and have engaged in discovery relevant to Marrero's alleged mental retardation. However, they have discussed settling that case, with the result being that the Commonwealth would agree to vacate Marrero's death sentence and impose a sentence of life imprisonment. Before they can reach a firm settlement, however, Marrero's guilt phase claims pending before this Court must be resolved.

After I lifted the stay, Marrero filed a *Memorandum in Support of Four Guilt Phase Claims* (Doc. No. 26) and the Commonwealth filed its *Memorandum of Law in Opposition of Four Guilt Phase Claims.*[1] (Doc. No. 30).

_____

[1] The Commonwealth has submitted the transcripts of the state court proceedings and the records docketed in the state court file. The latter documents are numbered 1 through 77, and

## A. Relevant Factual and Procedural History

This case has a long factual and procedural history. I shall recite only that which is relevant to the resolution of the issues currently before me.

On or around February 3, 1994, the Commonwealth charged Marrero with the criminal homicide of Elizabeth Smith, with the burglary of her residence, and with rape and other related crimes. The Honorable Shad Connelly of the Court of Common Pleas of Erie County appointed Timothy J. Lucas, Esquire, to represent Marrero as his defense counsel. On March 25, 1994, William R. Cunningham, then the District Attorney of Erie County, filed a notice advising the defense that in the event a jury convicted Marrero of first degree murder, the Commonwealth intended to seek the death penalty. Lucas believed that Marrero "faced a very, very grave risk of the first degree murder conviction and the death penalty" and began negotiating with the Commonwealth for a plea deal. (8/6/98 Post Conviction Relief Act ("PCRA") Hearing Tr. at 61). Eventually, the Commonwealth and the defense reached an agreement by which, *inter alia*, Marrero would plead guilty to first degree murder and related offenses, and in exchange he would receive a life sentence and the Commonwealth would dismiss the rape charge and an abuse of corpse charge. Further, the Commonwealth agreed that a receiving stolen property charge would merge with a theft charge. Lucas advised Marrero to accept the Commonwealth's plea offer.

Marrero initially followed Lucas's advice. On June 20, 1994, he entered his pleas in a proceeding presided over by Judge Connelly. At that proceeding, Marrero stated that he had read the plea documents and that he understood his rights, the charges against him, and the burden of

shall be cited to as "SCR No. ___ ." Additional state court records are also contained in a separate, two volume, submission. Records contained in those volumes shall be cited to as "SCR Vol. 1" or "SCR Vol. 2."

proof that the Commonwealth would have at trial. (6/20/94 Tr. at 9-37). After Marrero entered his pleas, Lucas noted for the record "that the affect which Mr. Marrero displays here today and the volume of his voice is consistent with all of the times that I have spoken with him. And by that I mean he's – while he's somewhat nervous, the manner in which he displays himself here today is the manner in which he has displayed himself consistently throughout my representation. This is not an unusual manner for him to appear." (Id. at 18-19). Lucas stated that he had spoken with Marrero "in detail about any potential defense that he might have available to this case" and that:

[t]he defense that I wanted to make sure the record reflects that was considered and rejected by me is related to any claim of any sort of psychiatric disabilities including any pharmacology issues that may have related to those matters. It was not a situation that called for even a request to have [a] Court appointed psychiatrist or psychologist appointed to examine Mr. Marrero.

In addition to that ... the police reports indicate from the witnesses who can recall the time Mr. Marrero had had a great deal to drink on this day. And the other defense that was considered was one of diminished capacity for purposes in potentially ... reducing first degree murder as that relates to the applicable law in Pennsylvania. So I want the record to reflect and I want the Court to know each of those defenses were carefully, and in some case laboriously, considered in light of the evidence that was presented by the Commonwealth through discovery.

(Id. at 19-20).

At the conclusion of the proceeding, Judge Connelly held: "[B]ased on the Court's observations, the plea colloquy of the record, Defendant's Statement of Understanding of Rights and the Criminal Information, all of which have been signed by the defendant and his attorney, the *Court finds the pleas to be voluntarily and knowingly entered and accepts the pleas at this time*." (Id. at 36 (emphasis added)). Judge Connelly scheduled Marrero's sentencing for July 29, 1994.

Lucas requested that Judge Connelly "consider ordering a psychiatric or psychological evaluation for the purposes of sentencing." (Id.) Judge Connelly stated in response: "I'm not sure

-4-

that's necessary Mr. Lucas. If you want me to, I will order a psychological on him. It's up to you." (Id.) Lucas answered that he thought an evaluation "may be of some benefit to the Court in sentencing[,]" and so an examination was ordered. (Id. at 36-37).

Prior to the date he was to be sentenced, Marrero notified Judge Connelly by letter that he wanted to withdraw his pleas because he was not guilty. Lucas learned that Marrero had sent the letter, met with Marrero, and advised him that withdrawing his pleas would allow the Commonwealth to reinstate all of the charges and seek the death penalty. Thereafter, Marrero wrote two more letters to Judge Connelly in which he asserted that he was not guilty of the offenses to which he had plead. Lucas met with Marrero again and advised him to consider the matter carefully for seven more days. After the expiration of that time, Marrero confirmed to Lucas that he wanted to withdraw his guilty pleas. (SCR No. 22).

On July 7, 1994, Lucas filed a motion to withdraw Marrero's guilty pleas on the basis that Marrero contended he was innocent. (Id.) There was no allegation that Marrero had been without the ability to understand or comprehend the plea proceeding. On that same date, Lucas filed a motion to withdraw as counsel. (SCR No. 23). In that motion, Lucas explained that he had met with Marrero on numerous occasions and that he had advised him not to withdraw his guilty pleas. Marrero had declined to follow his advice, Lucas wrote, and they had "reached an irreconcilable difference as to the manner in which the case should proceed." (Id.) Lucas further noted: "The discussions between counsel and defendant since the entry of the defendant's plea have destroyed the attorney-client relationship[.]" (Id.) Judge Connelly denied Lucas's motion to withdraw as counsel. He granted the motion to withdraw the guilty pleas, and scheduled Marrero's trial for October 17, 1994. (SCR No. 26).

-5-

In preparation for trial and to assist in the defense that Marrero's alcohol consumption had diminished his capacity to commit first degree murder, Lucas requested that the court provide funds so that the defense could hire a toxicologist. (SCR No. 27; 8/6/98 PCRA Tr. at 86). Lucas also requested funds so that the defense could retain a mental health expert in order to develop and present mitigating evidence in the event that Marrero was convicted of first degree murder and a capital sentencing hearing had to be conducted. (Id.; 8/6/98 PCRA Tr. at 86).

Judge Connelly granted the defense's request for funds on July 29, 1994. (SCR No. 28). Lucas then contacted a psychologist, Dr. Anthony Pissa, to schedule an examination of Marrero for the purpose of developing mitigating evidence for the sentencing hearing. (8/6/98 PCRA Tr. at 92-93). Lucas explained to Dr. Pissa that Marrero was uncooperative and refused to provide information about himself, and Dr. Pissa informed Lucas that there would be no benefit in doing a psychological assessment while Marrero was being obstinate. (Id.; see also 10/17/94 Trial Tr. at 7). Accordingly, no psychological examination was performed for the purpose of gathering mental health mitigating evidence.

Prior to the selection of jurors on Monday, October 17, 1994, Marrero had informed Judge Connelly in a letter that he wanted a new attorney because Lucas was not working on his defense and because Lucas had told him that "they'll kill me if I go to trial." (10/17/94 Trial Tr. at 2). Lucas explained to Judge Connelly on the record:

Your Honor, as The Court is aware, I've represented Mr. Marrero since you originally appointed me. I've seen him numerous times, certainly more than two times even within the last month, and my time records would reflect that as well. There have been times throughout my representation of him when he has vacillated in terms of what his wishes were in terms of the manner which he wanted the defense to proceed, including as I believe I advised the Court at one point in time, his indication to me was that he wanted to plead guilty to first degree murder and receive the death

-6-

penalty, which is what his wishes were when I started to represent him.

Throughout my initial representa tion and discussions with the District Attorney, we arranged the plea agreement. He had entered a plea and subsequently withdrew that plea. After the withdrawal of the plea and after I had petitioned the Court to withdraw as counsel, he became noncommunicative and refused to talk to me, and, in fact, hasn't talked to me about anything substantive for several months. I had visited with him in jail, always with someone else so that if the need ever arose to substantiate that, it can, in fact, be substantiated. That is that despite – despite the investigation that was being conducted on Mr. Marrero's behalf, specifically into the issue of diminished capacity based on voluntary intoxication, that he would not provide any information, would not indicate any recollection of the events surrounding the incident when it occurred.

I had also questioned him in an effort to provide death penalty evidence regarding his childhood, his background, his relationships with his family. He refused to provide any information with regard to that, all of what has been witnessed by John Ross who is the court appointed private investigator. And that is sort of the relationship, I guess you might say, that I've had with Mr. Marrero.

Most recently, his reference there to my telling him that he would be on death row or that they will kill him relates to my belief in counseling him that he should not withdraw his guilty plea. That, in fact, if he withdrew his guilty plea, that there was a very strong– not only would the jury convict him of first degree murder, but in addition to that, the Commonwealth would likely prevail, in my opinion on the death penalty phase.

- - -

... I'm more than confident and comfortable with my knowledge of the facts and my potential defenses that exist. There are two critical areas though with ... Mr. Marrero having become noncommunicative with me after the withdrawal of his plea which have hampered this representation of the defense. Specifically they are, he denies any remembrance and refused to provide any information to me if he had such a remembrance of the incident itself, and the circumstances surrounding the incident as they are related to alcohol ingestion in an effort to determine whether there existed the potential for the diminished capacity defense on the basis of voluntary alcohol ingestion. Secondly, because he was noncommunicative and was unable or unwilling to provide me with background information other than what I was able to glean from discovery materials provided by the Commonwealth as to the number of brothers and sisters he had, whether his parents are dead or alive, were he went to school, what jobs he may have held, any information at all relating to his relationship with the family in Cleveland, all in an effort to determine whether or not any evidence existed that would allow me to place mitigating evidence before the jury was also hampered in that regard.

I did use Mr. Ross, the investigator that The Court allowed to be appointed, to go to Cleveland at least on two occasions, perhaps on three occasions attempting to find out as much background information on Mr. Marrero as possible. I also spoke

-7-

with a psychologist by the name of Anthony Pisa [sic], who I've used in the past. In consulting with him, he told me basically that it wouldn't be worth his time or The Court's or taxpayers of Pennsylvania to come here if, in fact, Mr. Marrero would not provide that basic information, that he would be unable and incapable of rendering any kind of psychological opinion without those kinds of facts being related to him that he could then somehow or other use to provide an opinion based on his depravation and his childhood or whatnot.

So, those are two very real circumstances that have been difficult. Frankly, I don't know whether any other – whether any new counsel or different counsel would have had any different results.

(Id. at 3-7).

In response, Judge Connelly stated that he had "been involved in this case as The Judge since the beginning" and that Lucas's representation "has been appropriate and adequate and competent, and that if there was any problem in terms of your ability to proceed in this case either for trial or for the penalty phase, it's been directly because of the defendant's refusal to provide any information necessary on a number of occasions and therefore his request for new counsel is denied[.]" (Id. at 7-8). Marrero then stated that he did not want Lucas as his lawyer because Lucas would not defend him. (Id. at 11-12). Judge Connelly told Marrero that Lucas would be his counsel, and when Marrero refused to sit down, Judge Connelly told him that he would send him back to the jail and that he would be tried *in absentia*. (Id. at 12-14). Marrero said: "Take me back then. I'm not going with him. I'm not going with him. I ain't going to take this with him. He already told me he would see me in death row and everything." (Id. at 14). Judge Connelly remanded Marrero back to the jail for the day. (Id. at 15). The parties proceeded to pick the jury in his absence.

Marrero's trial resumed on Wednesday, October 19, 1994. That morning, before Judge Connelly gave the jury the introductory instructions, an in-chambers conference was held. Judge Connelly stated on the record that he had received a note from Marrero, dated October 18, 1994, in

-8-

which Marrero had written that he was ready to return to his trial. (10/19/94 Trial Tr. at 2). Marrero

rejoined the proceeding.

The Supreme Court of Pennsylvania summarized the evidence presented at Marrero's trial

as follows:

The evidence at trial was that on January 16, 1994, sixty-eight year old Elizabeth Smith was found murdered in her ransacked apartment in Erie, Pennsylvania by her son and landlord. Erie police officers, who responded to the scene of the crime, testified that they found the victim, who was dependent on an oxygen tank due to emphysema, lying on her back, stripped from the waist down with her legs spread apart. A Nintendo game set and a diamond ring were missing from her residence.

Ten days later, on January 26, 1994, the Cleveland, Ohio Police Department was contacted by a source who suspected that [Marrero] had killed someone. The source based that suspicion on the fact that [Marrero], whom the source knew did not own an automobile, was driving a car [which was later determined to have belonged to the victim], that there were blood stains on his clothing and hands and that [Marrero] had scratch marks on various parts of his body. While investigating that report, the Cleveland police were informed by [Marrero's] girlfriend's children that [he] had returned to Cleveland from a trip to Erie and had given a diamond ring to their mother (his girlfriend) and a bloodied Nintendo set to them. Both the ring and the Nintendo set were identified at trial as belonging to the victim.

[Marrero's] girlfriend's brother, who lived in Erie across the street from the victim, also contacted the Erie police on January 26, 1994, and informed them that [Marrero] had shown up unexpectedly at his apartment in Erie on the night of January 12, 1994. [Marrero] stated upon leaving the brother's apartment that evening that he was going to get some money. He did not return to the brother's apartment until early the next morning before returning to Cleveland. An acquaintance of [Marrero's] also testified that he had been with [Marrero] in Erie on January 12, 1994, in the vicinity of the victim's house, and that when he and [Marrero] parted company that evening, [Marrero] had said to him that he was going to the "old lady's" house. Testimony at trial established that the victim had died the next day, January 13, 1994, during the early morning hours.

[Marrero] was arrested by the Cleveland police at 9:20 p.m. on January 26, 1994, on charges of receiving stolen property relating to his possession of the victim's automobile. Although the Cleveland police twice advised [Marrero] of his Miranda rights, they did not interrogate [him] after arresting him. Instead, aware of the pending murder investigation in Pennsylvania, they notified detectives in Erie of

-9-

[Marrero's] arrest. Erie detectives then traveled to Cleveland, arriving at approximately 3:00 a.m., at which time they again advised [Marrero] of his Miranda rights. [Marrero] indicated he understood his rights and signed a waiver at 3:20 a.m. Thereafter, [he] spoke to the Erie detectives about the murder for approximately 45 minutes. After speaking with the detective, [Marrero] agreed to have his statements videotaped.

At 4:30 a.m. the Erie detective, prior to the taping, again gave [Marrero] his Miranda rights, which [he] again waived. His videotaped statement was completed at approximately 5:30 a.m. [He] admitted in each statement that he broke into the victim's home and attempted to strangle her to death. He further admitted that he ultimately stabbed the victim in the neck to ensure that she was dead.

At trial, the forensic pathologist testified that the victim died as a result of manual strangulation. The pathologist and a DNA expert further testified that the traces of blood and semen found at the victim's house matched [Marrero's] blood and DNA profile. Photographs taken at the scene of the crime were also admitted to show that [Marrero] had broken into the victim's home and dragged the victim from the living room to a hallway off the dining room where she ultimately died.

Commonwealth v. Marrero, 687 A.2d 1102, 1104 (Pa. 1996) ("Marrero 1") (footnotes omitted).

During the trial, and after the Commonwealth had rested its case, Judge Connelly questioned Marrero about whether he wished to testify in his own defense. Marrero stated that he understood his rights and that he did not wish to testify. Judge Connelly asked Lucas if he had discussed the matter with Marrero, and Lucas responded that he had and that Marrero consistently had maintained that he did not wish to testify. Judge Connelly held: *"The Court then finds the decision to be a voluntary and knowing one and orders that it remain a part of the record."* (10/24/94 Tr. at 22-24 (emphasis added)).

On the sixth day of trial, Tuesday, October 25, 1994, the jury found Marrero guilty of first degree murder, burglary, theft by unlawful taking, and possessing instruments of crime. The jury found him not guilty of rape, and Judge Connelly entered judgments of acquittal on charges of receiving stolen property and abuse of a corpse. That same day, Marrero's sentencing hearing was

-10-

conducted. Marrero stated that he did not wish to testify and that he understood the significance of the sentencing hearing. (10/25/94 Trial Tr. at 62-63). Judge Connelly held that Marrero's decision not to testify was "*a voluntary and knowing one*." (Id. at 63 (emphasis added)).

At the conclusion of the sentencing hearing, the jury announced that they had found one aggravating circumstance (that Marrero had committed the murder while in the perpetration of a felony) and one mitigating circumstance (that his personality changes when using alcohol). They determined that the aggravating circumstance outweighed the mitigating circumstance, and Marrero was sentenced to death on the first degree murder conviction.

Judge Connelly appointed Joseph P. Burt, Esquire, to represent Marrero on appeal. (SCR Nos. 43, 47, 53). Marrero raised several claims on appeal, none of which the parties assert are relevant to this habeas proceeding. On April 10, 1995, Judge Connelly issued an Opinion as required by Pennsylvania Rule of Appellate Procedure 1925(c) in which he addressed Marrero's claims and determined that they had no merit. (SCR No. 49). Lucas again filed his appearance on behalf of Marrero and he argued the appeal before the Pennsylvania Supreme Court on September 20, 1995. (See SCR No. 52).

On December 26, 1996, the Pennsylvania Supreme Court affirmed Marrero's judgment of conviction and sentence. Marrero 1, 687 A.2d at 1103-12. The United States Supreme Court denied the petition for writ of certiorari on November 10, 1997. Marrero v. Pennsylvania, 522 U.S. 977 (1997).

On December 22, 1997, Marrero filed a *pro se* motion for collateral relief in the Court of Common Pleas pursuant to the PCRA. (SCR No. 58). Judge Connelly appointed William J. Hathaway, Esquire, to represent Marrero. Hathaway filed an *Amended Motion for Post Conviction*

-11-

*Collateral Relief* (the "*amended PCRA motion*") (SCR No. 66) and a *Brief In Support of Amended*

*Motion for Post Conviction Collateral Relief* (SCR No. 65). The following five claims were raised:

PCRA Claim 1:     Lucas was ineffective for failing to pursue an expert evaluation of Marrero
                  as to his competency to assist in his defense in the form of psychological
                  testing, evaluation of his intelligence level and/or a determination as to
                  whether the language barrier was affecting the attorney-client relationship;

PCRA Claim 2      Lucas was ineffective for failing to seek examination of the venirepersons as
                  to racial bias in a timely manner;

PCRA Claim 3      Lucas was ineffective for failing to identify, investigate and present all
                  relevant and discoverable mitigating circumstances for purposes of the
                  penalty phase of trial, which resulted in the omission of witnesses and
                  relevant mitigating evidence;

PCRA Claim 4      Lucas was ineffective for advising Marrero not to testify during the penalty
                  phase of trial; and,

PCRA Claim 5      Lucas was ineffective for failing to articulate an argument that Marrero's
                  acceptance of responsibility should have been considered as a catch-all
                  mitigator.

(SCR No. 66 at ¶¶ 22(a)-(f); SCR No. 65 at 5-35).

PCRA Claim 1 is relevant to this federal habeas proceeding because Marrero contends that

it is the same claim as Claim B of the instant habeas petition. In support of PCRA Claim 1, Marrero

contended that he was "constructively incompetent [to stand trial] as he failed to assist defense

counsel for the purpose of preparing a defense." Marrero specifically argued that when it became

apparent that his relationship with Lucas had broken down and that he would not communicate with

Lucas, both Lucas and Judge Connelly should have been alerted to a potential issue regarding his

competency. He claimed that he was denied his Sixth Amendment right to effective assistance of

counsel and that he was denied a fair trial because his competency was not evaluated. (SCR No. 65

at 5-11).

In its *Answer to Petition for Post Conviction Collateral Relief* (SCR No. 68), the Commonwealth contended, *inter alia*, that the record demonstrated that there was no issue with respect to Marrero's competency during the pre-trial and trial proceedings and that therefore Lucas was not ineffective for failing to request a competency hearing. The Commonwealth further argued that the record revealed that Marrero was an obstinate and uncooperative client and that those behaviors were purposeful and intentional, and not the product of any mental infirmity. (SCR No. 68 at 5-7).

On June 10, 1998, Judge Connelly issued an order granting Marrero an evidentiary hearing on his claims that he received ineffective assistance of counsel with respect to his capital sentencing (PCRA Claims 3, 4 and 5).[2] (SCR No. 69). With respect to PCRA Claim 1, Judge Connelly held: "The issue of defendant's competency, paragraph 22(a), and his allegations thereto are contradicted by the record and meritless." (Id. at 1-2). He further held: "The record, *inter alia*, reveals the defendant understood and acknowledged his rights, and the charges against him, when he gave a video taped statement to police, at his formal arraignment, pre-trial suppression hearing, entry of a voluntary, knowing[,] intelligent guilty plea, and withdrawal of that plea based on an assertion of innocence, and further the defendant demonstrated his ability to cooperate with counsel when he chose to." (Id. at 2 n.2). Judge Connelly denied PCRA Claim 2 on the procedural basis that it was

---

[2] Pursuant to the Pennsylvania Rules of Criminal Procedure, claims raised in a PCRA motion may be summarily dismissed without a hearing if the judge is satisfied that there are no genuine issues concerning any material fact and that the petitioner is not entitled to post-conviction collateral relief on that claim. See Pa.R.Crim.Pro. 907, Disposition Without Hearing, (formerly Rule 1507); Pa.R.Crim.Pro. 909, Procedures for Petitions in Death Penalty Cases; Hearing; Disposition, (formerly Rule 1509); Commonwealth v. Morris, 684 A.2d 1037, 1042 (Pa. 1996) (no need for evidentiary hearing under PCRA where there are no genuine factual issues to be resolved).

previously litigated. (Id. at 1-2).

Judge Connelly presided over the PCRA evidentiary hearing on August 5 and 6, 1998. Both Marrero and Lucas testified at the hearing. John Ross (Marrero's court appointed investigator for his trial), Carmen Roche (Marrero's mother), Catalino Marrero (his paternal uncle), and Migdalia Alvarado (his wife), also testified.

Lucas testified that he met with Marrero approximately two times a month during his nine month representation of him, and that he likely met with Marrero fifteen to twenty-five times in total. (8/6/98 PCRA Tr. at 59). He said that Marrero was a very difficult and uncooperative client, that their relationship was strained, and that Marrero would often respond to his questions in a very limited fashion or not at all. (Id. at 63, 72, 77-81). Lucas stated that at first he thought that Marrero's purported lack of memory stemmed from his previous drug or alcohol abuse. (Id. at 87). He said that he looked for some other possible explanation as to why Marrero could not remember things, but that he soon determined that Marrero was deliberately refusing to cooperate with him. (Id. at 87-88). Lucas testified: "At some point in time it became apparent to me that that was the manner in which [Marrero] intended to proceed throughout the course of my representation." (Id.) In Lucas's estimation, Marrero was either relying on the advice of other inmates, who were "going to lead him down a path of getting killed," or he "was trying to set the situation up for what we [have] here" – *i.e.*, trying to create a situation in which Lucas would later appear to have been ineffective. (Id. at 90, 106). Lucas described counseling Marrero to accept the Commonwealth's plea offer, and also stated that after Marrero decided to withdraw his pleas, he met with Marrero on many occasions with defense investigator John Ross. During those meetings, Lucas explained to Marrero Ross' role, the trial process and procedure, the role of the guilt and penalty phase of the trial, the necessity to

-14-

develop and present mitigating evidence in the event that the jury convicted him of first degree murder, and counseled him on whether he should testify. (Id. at 61-64, 78, 89-90, 99-102). Lucas noted that Marrero gave him very little useful information about his family and background, that Marrero would often say that he did not remember certain things, and that Marrero also would deny other things that were demonstrably true, like his prior criminal record. However, Lucas stated that Marrero had informed him that that he had been born in Philadelphia, had lived in Puerto Rico and Cleveland, had not finish high school, and that he did not know where his mother, father, or brother and sisters were located. (Id. at 65-67, 103-06).

Prior to the PCRA hearing, Judge Connelly had ordered a psychological evaluation of Marrero. (See 8/6/98 PCRA Tr. at 113). Clinical psychologist Steven J. Reilly, M.A., submitted his report to Judge Connelly on or around August 10, 1998.[3] Dr. Reilly explained that Marrero displayed "questionable motivation and lack of truthfulness throughout his assessment," and noted:

Unfortunately, due to Mr. Marrero's avoidance and lack of motivation, the psychological testing that was generated is considered invalid. Overall, it is this examiner's opinion that Mr. Marrero was not truthful during his assessment and showed many inconsistencies which would lead this examiner to believe that he is a malingerer. Memory scale examinations include intelligence testing fell within the mentally retarded range, mild category (Over, estimated I.Q. of 61, invalid). These scores are contrary to alleged school performance levels by Mr. Marrero and other areas of expertise which he claims to have the ability to perform such as auto mechanics (specifically transmission repair), and ability to rapidly multiply, divide, and add without the use of pen and paper. "This fake bad" approach was a steady stream and/or presentation during the subject's entire psychological evaluation. I feel that the subject was deliberately withholding information in order to present an unrealistic clinical profile and/or image of him. He also appeared very controlled and lacked insight into his own behavior, however, there was deliberate effort on his part to present an unfavorable impression of him thus he was unwilling to acknowledge

---

[3] Dr. Reilly's entire report has not been submitted to this Court. A portion of his report is appended as Exhibit A to *Brief for Appellee*, Commonwealth v. Marrero, Capital Appeal Docket No. 243 of the Pennsylvania Supreme Court (SCR Vol. 1).

-15-

his true strengths and weaknesses. When challenged on his lack of effort, Mr. Marrero became extremely defensive, argumentative, and hostile. He often externalized blame for his anger and repeatedly indicated that any short or long term memory difficulties were the result of his drug addiction. Often times the subject surrendered quite easily and put forth little effort in order to cooperate or develop a measurable clinical profile. He also appears somewhat suspicious of my motives and likely suffers from mild paranoid features. Furthermore, his interpersonal relationship skills and mannerisms were quite limited and he expressed little genuine concern or sincerity during the mid point of his assessment.

Unfortunately, the subject's need to examine the possibility of organic mental defect or other mental impairment could not be developed within this assessment due to Mr. Marrero's questionable motivation and lack of truthfulness through his assessment. Non testing information indicates that his recent memory is quite normal and any alleged amnesia suffered appears due to a long history of substance abuse difficulties. Again, these are Mr. Marrero's claims, however, they could not be specifically validated regarding any organicity problems due to his lack of effort during his assessment. Remote memory regarding childhood and the circumstances surrounding his relationship with his parents appears quite good. Thus, retention and recall are within normal ranges regarding his personal experiences as a child and adolescent. His speech did not reflect the presence of a psychiatric disorder, nor did this examiner observe any mental or emotional maladjustment through the subjection's assessment. Conversation quality or thought stream indicates that the subject's overall field appeared clear, logical, and relevant. He did not appear overly confused, however, there was some distractability difficulties observed.

After receiving Dr. Reilly's report, Judge Connelly distributed it to the parties and instructed them to submit briefs.

On September 16, 1998, Judge Connelly issued an Opinion resolving Marrero's outstanding PCRA claims. (SCR No. 73). He denied PCRA Claim 3 on the merits. Judge Connelly rejected Marrero's contention that Lucas was ineffective for failing to present additional mitigating evidence at the sentencing hearing because, *inter alia*, he found that Marrero had refused to cooperate with Lucas. Judge Connelly also concluded that Marrero had abandoned PCRA Claims 4 and 5 for failing to brief those claims in his post-hearing submission. He further held that even if those claims were not abandoned, they were meritless. (Id.)

On September 28, 1998, Marrero, through Hathaway, filed an appeal to the Pennsylvania

Supreme Court. (SCR No. 74; see also *Brief for Appellant*, Commonwealth v. Marrero, Capital

Appeal Docket No. 243 of the Pennsylvania Supreme Court, SCR Vol. 1). Marrero raised on appeal

the same claims that he had raised in the *amended PCRA motion*. He did not challenge Judge

Connelly's decision to summarily dismiss his competency and related ineffective assistance of

counsel claims without a hearing. On January 13, 1999, the Commonwealth filed its *Brief for*

*Appellee* (SCR Vol. 1).

Seven months later, on August 6, 1999, attorneys from the Capital Habeas Corpus Unit of

the Federal Community Defender for the Eastern District of Pennsylvania (hereinafter, "the Capital

Habeas Corpus Unit") attempted to intervene in the pending appeal by filing with the Pennsylvania

Supreme Court an *Application Pursuant to Pennsylvania Appellate Rule 2501(a) to File a Post-*

*Submission Communication,*[4] and an accompanying *Motion for Remand.* (SCR Vol. 2). In that

application, it was asserted that Hathaway had failed to raise viable claims for post-conviction relief

before the Court of Common Pleas and it was requested that the case be remanded so Marrero could

raise those additional PCRA claims. On August 19, 1999, the Commonwealth filed an *Answer*

opposing the Capital Habeas Corpus Unit's application. (SCR Vol. 2).

_____

[4] Pennsylvania Rule of Appellate Procedure 2501, Post-submission Communications,
provides:

> (a) General rule. After the argument of a case has been concluded or the case has
> been submitted, *no brief, memorandum or letter relating to the case shall be*
> *presented or submitted, either directly or indirectly, to the court or any judge*
> *thereof, except upon application or when expressly allowed at bar at the time of*
> *the argument.*

(emphasis added).

-17-

On February 22, 2000, the Pennsylvania Supreme Court issued a decision affirming the denial of PCRA relief. Commonwealth v. Marrero, 748 A.2d 202 (Pa. 2000) ("Marrero 2"). It interpreted PCRA Claim 1[5] as asserting a claim of ineffective assistance of counsel challenging Lucas's failure to inquire into Marrero competency by seeking a mental health evaluation. Id. at 203. It held that the record revealed that Lucas did seek an appointment for a mental health expert prior to the trial, and that his efforts to secure an expert evaluation were "precluded by [Marrero's] refusal to cooperate with trial counsel or assist in his own defense." Id. at 204.

Approximately seven days later, on February 29, 2000, Hathaway filed with the Pennsylvania Supreme Court an application for permission to withdraw as counsel, the Capital Habeas Corpus Unit filed a motion for reargument. On March 17, 2000, the Governor of Pennsylvania signed a death warrant directed at Marrero. On April 10, 2000, the Pennsylvania Supreme Court issued an order granting Hathaway's request for permission to withdraw. On that same date, it issued a separate order denying the Capital Habeas Corpus Unit's application to file a post-submission communication under Appellate Rule 2501(a) and denying the motion for reargument.

On April 11, 2000, the Capital Habeas Corpus Unit commenced this federal habeas proceeding by filing a motion to stay Marrero's execution and a motion for appointment of counsel. I referred the case to Magistrate Judge Francis X. Caiazza.

On November 7, 2000, Marrero filed with this Court his *Petition for Writ of Habeas Corpus and Consolidated Preliminary Memorandum of Law* pursuant to 28 U.S.C. § 2254. (Doc. No. 7). As noted above, during the course of the litigation of the *Petition*, the United States Supreme Court

---

[5] At points in its decision the Pennsylvania Supreme Court erroneously referred to PCRA Claim 1 as Claim 3.

decided Atkins. On August 14, 2002, Marrero filed a second PCRA motion in the Court of Common Pleas and raised an Atkins claim. Since Marrero had included a pre-Atkins claim in the *Petition* before this Court alleging his execution would violate the Eighth Amendment because of mental retardation (Claim I), the parties were ordered to brief the question of whether Claim I was exhausted. (Doc. No. 18).

Marrero argued that he had exhausted Claim I because he had raised that claim in the *Motion for Remand* that the Capital Habeas Corpus Unit unsuccessfully had attempted to file in the Pennsylvania Supreme Court under Appellate Rule 2501(a). (Doc. No. 20). On November 1, 2002, the Magistrate Judge issued a Report and Recommendation ("R&R"), in which he rejected Marrero's exhaustion argument and recommended that this proceeding be stayed while Marrero litigated his Atkins claim in state court, explaining:

> In the present case, I conclude that Marrero has not exhausted the Eighth Amendment claim that he raises today. To begin, he failed to adequately present this claim to each level of the Pennsylvania state courts for review. The claim was not raised at trial or on appeal to the Pennsylvania Supreme Court. Commonwealth v. Marrero, 687 A.2d 1102 (Pa. 1997). And it was not raised in the PCRA petition that he presented to the state courts. Commonwealth v. Marrero, 748 A.2d 202 (Pa. 2000). To satisfy the exhaustion requirement, a habeas petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Obviously, Marrero failed to do just that. He never once presented his claim during the formal appellate process established under Pennsylvania law. His failure to do so means that his claim is not exhausted.
>
> I acknowledge that Marrero raised the Eighth Amendment claim in a Motion to Remand filed with the Pennsylvania Supreme Court during the midst of his PCRA proceedings in that Court. (Motion to Remand, 8/6/1999, at 73). But, that was hardly the "established" means of presenting a claim in state court at the time. O'Sullivan, 526 U.S. at 845. In fact, Marrero's support for filing such a motion to remand was Rule 2501(a) of the Pennsylvania Rules of Appellate Procedure, a rule that flatly prohibited his attempt to circumvent the state's "established appellate review process." O'Sullivan, 526 U.S. at 845.

-19-

(Doc. No. 21 at 2-3).

Marrero did not file an objection to the R&R. On November 26, 2002, I adopted the R&R as the Opinion of this Court and I stayed this proceeding. (Doc. No. 22).

On November 18, 2002, Judge Connelly denied the second PCRA motion as untimely filed. Marrero appealed to the Pennsylvania Supreme Court, and on November 21, 2006, it issued an order remanding the case for a hearing to determine whether he is a person with mental retardation. Commonwealth v. Marrero, 909 A.2d 802 (Pa. 2006). Marrero's Atkins claim is currently pending before the Court of Common Pleas and both he and the Commonwealth have retained experts in anticipation of hearing in that court.

In October 2007, Marrero's counsel filed an unopposed motion to reactivate this habeas proceeding. (Doc. No. 23). It was explained therein that the Commonwealth and Marrero have discussed resolution of the Atkins claim without the need for additional time consuming and expensive litigation. However, Marrero's counsel further explained that although Marrero would be glad to see the death penalty removed as a punishment based upon a determination that he is a person with mental retardation, he is unwilling to discontinue this federal habeas corpus litigation, which the Commonwealth has required as a condition of its agreement that Marrero is entitled to Atkins relief. As a result, both parties agree that the resolution of Marrero's federal habeas guilt phase claims stand between the parties and resolution of the Atkins claim, and they request that this Court rule on his four guilt phase claims. Should I deny Marrero's guilt phase claims, the parties have explained that they will return to the state court to resolve the Atkins issue. In that event, the parties request that I place the remaining penalty phase claims in suspense pending the state court's resolution of the Atkins issue.

## B. Discussion

### 1. Habeas Claims D, E, and H

The federal habeas corpus statute provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that" "the applicant has exhausted the remedies available in the courts of the State[.]" 28 U.S.C. § 2254(b)(1)(A). As has been explained previously, the exhaustion doctrine requires a petitioner to provide the state courts with "*one full opportunity*" to rule on his or her federal habeas claims before presenting those claims to the federal courts. O'Sullivan, 526 U.S. at 844-45; Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000) (in order for a claim to have been properly exhausted, it "must have been fairly presented *to each level of the state courts*[.]" (citing 28 U.S.C. § 2254(b) and O'Sullivan (emphasis added)). The burden of establishing that his federal constitutional claims were fairly presented to all levels of the state judicial system falls upon the petitioner. Lines, 208 F.3d at 159 (citation omitted). To meet this burden, the petitioner must demonstrate that he raised the claims at issue in the proper state forums through the proper vehicle, not just that he raised a federal constitutional claim before a state court at some point. O'Sullivan, 526 U.S. at 845 (a petitioner must have presented a claim through the "established" means of presenting a claim in state court at the time); Ellison v. Rogers, 484 F.3d 658, 660-62 (3d Cir. 2007) (the petitioner's claims of ineffective assistance were not exhausted even though he had raised those claims on direct review; state law required that ineffective assistance claims be raised in state post-conviction review, and the petitioner had not sought such review).

The Commonwealth contends that Marrero did not properly exhaust three of his pending guilt phase claims – Claims D, E, and H – and as a result has procedurally defaulted those claims. In

-21-

response, Marrero asserts that he exhausted Claims D, E, and H because those claims were presented in the *Motion for Remand* that attorneys from the Capital Habeas Corpus Unit sought (unsuccessfully) to file on his behalf when his first PCRA appeal was pending before the Pennsylvania Supreme Court. Marrero candidly admits, however, that he raised this exact argument in his memorandum addressing the exhaustion of the Eighth Amendment Atkins claim and that this Court rejected that argument. He concedes that that prior ruling constitutes the "law of the case."[6] (Doc. No. 26 at 8).

Accordingly, because this Court has previously rejected Marrero's contention that claims raised in the *Motion for Remand* were properly exhausted for federal habeas corpus purposes, that issue will not be revisited for a second time. As a result, I must find that Marrero failed to properly exhaust Claims D, E, and H. Marrero acknowledges that it would be "futile" for him to return to the state court and attempt to exhaust those claims now and that therefore those claims are procedurally defaulted.[7] (Doc. No. 26 at 8). Accordingly, I conclude that Claims D, E, and H are procedurally

---

[6] The "law of the case" doctrine "expresses the practice of courts generally to refuse to reopen what has been decided." Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997) (internal quotations and citations omitted). "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983) (citations omitted).

[7] When a petitioner has failed to properly exhaust a claim, the federal district court should require that he return to state court and attempt to litigate that claim there *if state procedural rules still permit him to raise the claim in state court.* See Slutzker v. Johnson, 393 F.3d 373, 379-81 (3d Cir. 2004); Crews v. Horn, 360 F.3d 146 (3d Cir. 2004). When a petitioner would be barred under state law from raising a claim because he failed to comply with a state procedural rule – such as a statute of limitations or a waiver rule – the Court of Appeals for the Third Circuit has recognized that it would be "futile" to require the petitioner to return to state court. Under that circumstance, the Third Circuit Court has held that the petitioner is technically excused from having to comply with the exhaustion requirement, *but that the claim is procedurally defaulted.* Id.; Whitney v. Horn, 280 F.3d 240, 250-53 (3d Cir. 2002); Lines, 208

-22-

defaulted and I deny those claims on that basis.

## 2. Habeas Claim B

In Claim B, Marrero argues that he was denied his due process rights because he was tried while incompetent. He also contends that Lucas was ineffective for failing to request a competency evaluation and hearing and that Judge Connelly erred in not providing such a hearing. (See Doc. No. 26 at 9-25). The Commonwealth does not contest Marrero's contention that he exhausted Claim B in state court by raising it in the first PCRA proceeding as PCRA Claim 1. (See Doc. No. 29 at 8).

### (a) Standards of Review

This proceeding is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C.§ 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132 § 104, 110 Stat. 1214. AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). As codified at 28 U.S.C. § 2254(d), it provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to,[8] or involved an unreasonable

---

F.3d at 162-63, 166 (when exhaustion is futile, the claim is procedurally defaulted; "The equitable principles governing habeas relief will not permit [the petitioner] to create a situation in which seeking state post-conviction relief is futile, and then invoke that same futility to avoid the exhaustion requirement.")

[8] "A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and

application of,[9] clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1) & (2). See also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).

As the introductory sentence of § 2254(d) makes explicit, the standard of review set forth therein applies to only those claims that were "adjudicated on the merits" by a state court. See Fahy v. Horn, 516 F.3d 169, 197, 203 n.36 (3d Cir. 2008) (§ 2254(d)'s deferential standard of review applied to the Common Pleas Court's decision on the merits, even though when considering that same claim in the subsequent appeal, the Pennsylvania Supreme Court rejected it on procedural grounds). When a claim was not "adjudicated on the merits," review is *de novo*. Rompilla v. Horn, 355 F.3d 233, 243 (3d Cir. 2004), rev'd on other grounds sub nom., 545 U.S. 374 (2005); see also Chadwick v. Janecka, 312 F.3d 597, 605-07 (3d Cir. 2002).

Importantly, regardless of whether a given claim was adjudicated on the merits and is subject to AEDPA's standard of review codified at § 2254(d), a state court's factual determinations are presumed to be correct under AEDPA pursuant to 28 U.S.C. § 2254(e)(1). See Lambert, 387 F.3d at 239. Section 2254(e)(1) instructs that "a determination of a factual issue made by a State court

---

nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

[9] "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Lambert, 387 F.3d at 234 (quoting Williams, 529 U.S. at 407).

shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[10] (emphasis added).

### (b) Legal Analysis

Marrero contends that his substantive due process rights were violated because he was tried while incompetent. The United States Supreme Court set the basic standard for competency in Dusky v. United States, 362 U.S. 402 (1960) and Drope v. Missouri, 420 U.S. 162 (1975). See also Pate v. Robinson, 383 U.S. 375, 385 (1966); Godinez v. Moran, 509 U.S. 389, 399-400 (1993); Taylor, 504 F.3d at 430. In Dusky, the Court held that to be considered competent, a defendant must have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and must possess "a rational as well as factual understanding of the proceedings against him." 362 U.S. at 402 (internal quotation marks omitted). Drope repeats that standard, stating that it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." 420 U.S. at 171.

Marrero also contends that his procedural due process rights were violated because Judge Connelly did not *sua sponte* conduct a competency hearing. (Doc. No. 26 at 23). "A trial court's failure to inquire into incompetency, *sua sponte*, where there is a reason to doubt a defendant's competency, violates due process because it deprives the defendant of his right to a fair trial."

---

[10] When the state trial court has not make an explicit finding of fact, the federal habeas court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000); see also Taylor v. Horn, 504 F.3d 416, 433 (3d Cir. 2007). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. Id. (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)).

Taylor, 504 F.3d at 433 (citing Drope, 420 U.S. at 172; Pate, 383 U.S. at 385-86); see also Hull v. Kyler, 190 F.3d 88, 105-06 (3d Cir. 1999) (the failure to provide adequate procedures to ensure that a defendant is competent deprives a defendant of his constitutional right to a fair trial). "But barring indicia of incompetence, due process does not require that a competency hearing be held." Id. (citing Godinez, 509 U.S. at 402 n.13). Marrero argues that the indicia of incompetence that should have alerted Judge Connelly that a competency hearing was required was Lucas's advisement on Monday, October 17, 1994 (the date that jurors were selected) that Marrero had become uncommunicative with him.

Judge Connelly rejected Marrero's substantive and procedural due process claims on the merits when he summarily dismissed PCRA Claim 1. (SCR No. 69 at 1-2). He denied PCRA Claim 1 on the basis that "[t]he issue of defendant's competency" "and his allegations thereto are contradicted by the record and meritless."[11]  (Id.) Judge Connelly also held that the record demonstrated that Marrero understood the proceedings against him and "his ability to cooperate with counsel when he chose to." (Id. at 2 n.2).

As the judge who presided over Marrero's pre-trial and trial proceedings, Judge Connelly was in a unique position from which he could assess the allegations made in PCRA Claim 1 against his extensive experience with the case. He had been able to make extended observations of Marrero during those proceedings. Moreover, he also had been obligated to be alert to signs that the defendant before him might be incompetent. Drope, 420 U.S. at 181. Judge Connelly denied the

_____

[11] Marrero may have issues with the manner in which in his PCRA counsel, Hathaway, presented and argued PCRA Claim 1 in the *amended PCRA motion*, but ineffective assistance of post-conviction counsel is not a ground for habeas relief. 28 U.S.C. § 2254(i); Coleman v. Thompson, 501 U.S. 722, 752 (1991) (noting no federal constitutional right to post-conviction counsel).

-26-

substantive and procedural due process claims based upon the record before him as well as his recollection of the trial proceedings, and summarily dismissed those claims as he was permitted to do under Pennsylvania law if he determined that those claims did not present issues that required further factual development. Considering the allegations made in PCRA Claim 1 and in the *amended PCRA motion* as a whole, the record before Judge Connelly, and the fact that Judge Connelly had presided over Marrero's pre-trial and trial proceedings and therefore could rely upon his own observations when ruling on the due process claims, I cannot say that his decision to deny those claims was "contrary to, or involved an unreasonable application of" Supreme Court precedent, or "was based on an unreasonable determination of the facts in light of the evidence presented" in the record before him. 28 U.S.C. § 2254(d)(1) & (2). See also Holland v. Jackson, 542 U.S. 649, 652 (2004) (*per curiam*) ("[W]e have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the [state] court had before it.") (citing Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (*per curiam*) (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697 n.4 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law)).

Marrero also is not entitled to habeas relief on his due process claims because Judge Connelly made several determinations that Marrero was competent during the 1994 criminal proceedings that this Court must presume to be correct under § 2254(e)(1). See e.g., Taylor, 504 F.3d at 433 (citing Thomas v. Keohane, 516 U.S. 99, 111 (1995) (citing Maggio v. Fulford, 462 U.S. 111, 118 (1983); Demosthenes v. Baal, 495 U.S. 731, 735 (1990)). During Marrero's June 20, 1994 plea proceeding,

Judge Connelly found as a fact that Marrero was competent. Specifically, at the conclusion of that proceeding, he ruled that Marrero had "voluntarily and knowingly entered" his guilty pleas. (6/20/94 Tr. at 36). As the Third Circuit Court recognized in Taylor v. Horn, 504 F.3d 416 (3d Cir. 2007), a state trial court's determination that a defendant's plea is voluntarily and knowingly entered is "*an implied finding of fact that he was competent.*" Id. at 431 (emphasis added). It reasoned:

In Godinez[ v. Moran], the Supreme Court explained:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.

509 U.S. at 401 n.12, 113 S.Ct. 2680 (citations omitted). If a defendant does not have the "ability" to understand the proceedings, it is impossible that he "actually does" understand them. It follows, then, that a finding of competence is a prerequisite to a determination that a plea is knowing and voluntary. Thus, the state trial court's determination that [the defendant's] plea was knowing and voluntary, included an implied finding that he was competent.

Id. (emphasis in original). Judge Connelly made additional findings of Marrero's competency during the trial. On October 24, 1994, he determined that Marrero's decision to waive his right to testify during the guilt phase of the trial was a "voluntary and knowing one." (10/24/94 Trial Tr. at 22-24). The next day, on October 25, 1994, Judge Connelly held that Marrero's decision to waive his right to testify during his sentencing hearing was a "voluntary and knowing one." (10/25/94 Trial Tr. at 63). Both of those rulings included an implied finding that Marrero was competent. See Taylor, 504 F.3d at 431.

I must presume that Judge Connelly's findings that Marrero was competent were correct, unless Marrero has rebutted "the presumption of correctness by clear and convincing evidence." 28

U.S.C. § 2254(e)(1); Taylor, 504 F.3d at 430-38. In order to rebut the presumption, Marrero relies on two categories of information: (1) records from the Pennsylvania Department of Corrections dated November 3, 4, 15, 21, 23 & 24, 1994, which he contends demonstrate that he was incompetent; and, (2) affidavits submitted by a psychiatrist, Julie Kessel, M.D., and a psychologist, Alan Hopewell, Ph.D., in which they opine that Marrero was not competent to stand trial. (See Doc. No. 7 at 37-45; Doc. No. 26 at 10-18).

An immediate problem with Marrero's reliance on the above-cited information is that he did not properly present any of it to the state court during the PCRA proceeding. The information was first proffered in support of the *Motion to Remand*, which the Capital Habeas Corpus Unit unsuccessfully attempted to file with the Pennsylvania Supreme Court. *Marrero did not present the DOC records, Dr. Kessel's affidavit, or Dr. Hopewell's affidavit with the amended PCRA motion* or at any other time before the PCRA court when he was litigating the claim there.[12] Marrero's DOC records were available when he raised PCRA Claim 1 in the Court of Common Pleas and could have been presented to support that claim. And, Marrero does not allege that he could not have had Dr. Kessel, Dr. Hopewell, or some other mental health expert examine him in order to support PCRA Claim 1. It would be improper for this Court to consider evidence of Marrero's purported incompetence during his 1994 trial proceeding when he could have, but did not, present that same

---

[12] The Pennsylvania Rules of Criminal Procedure require that in a PCRA petition, the petitioner must assert "the facts supporting each ground [for relief]." Pa.R.Crim.Pro. 902(A)(12) (formerly Rule 1502(A)(12)). The Rules further provide that when the facts supporting a ground for relief "do not appear in the record," the petitioner must identify "any affidavits, documents, and other evidence showing such facts." Id. Additionally, the Rules require that a petitioner "shall attach to the petition any affidavits, records, documents, or other evidence which show the facts stated in support of the grounds for relief, or the petition shall state why they are not attached." Pa.R.Crim.Pro. 902(D) (formerly Rule 1502(D)).

evidence to Judge Connelly in support of the *amended PCRA motion.* See Williams, 529 U.S. at 437 ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.")

Moreover, the record before this Court has never been expanded to include the DOC records or Dr. Kessel's and Dr. Hopewell's opinions. Marrero does request that I grant him an evidentiary hearing so that he may properly present evidence to support Claim B, but a federal habeas petitioner is not automatically entitled to an evidentiary hearing and AEDPA, as codified at 28 U.S.C. § 2254(e)(2), limits the ability of a federal district court to hold an evidentiary hearing in habeas review. See Williams, 529 U.S. at 429-440; Goldblum v. Klem, 510 F.3d 204, 220-21 (3d Cir. 2007); Taylor, 504 F.3d at 435-37; Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006). Section 2254(e)(2) provides, in relevant part:

> If the applicant *has failed to develop the factual basis of a claim in State court proceedings*, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
> (A) the claim relies on-
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(emphasis added). If the "failure to develop the factual basis of a claim in State court proceedings" is not attributable to the petitioner, then § 2254(e)(2) does not apply and it is within the district court's discretion to grant an evidentiary hearing on a claim. Schriro v. Landrigan, — U.S. — , 127

S.Ct. 1933, 1937, 1939 n.1 (2007); Rolan, 445 F.3d at 680-81; Thomas v. Varner, 428 F.3d 491, 497-98 (3d Cir. 2005).

Marrero does not reference § 2254(e)(2) or present any argument to this Court as to why he is entitled to an evidentiary hearing notwithstanding the limitations imposed by that statute. He states in a footnote that I am "obliged" to grant him an evidentiary hearing because "[h]e has pled facts which would entitle him to relief" (Doc. No. 26 at 25 n.8), but that is not the standard that a federal habeas petitioner must meet in order to surmount § 2254(e)(2)'s obstacle to a hearing. See Williams, 529 U.S. at 429-440; Schriro, 127 S.Ct. at 1937, 1939 n.1; Goldblum, 510 F.3d at 220-21; Taylor, 504 F.3d at 435-37. Rather, he first must show that the failure to present that evidence to the state court cannot be attributed to him and that therefore § 2254(e)(2)'s limitation does not apply.[13] Only once he has satisfied that burden may I consider whether I should exercise my discretion and grant him his request for an evidentiary hearing here. Marrero does not even address § 2254(e)(2)'s limitation to an evidentiary hearing, let alone demonstrate that he has overcome the burden imposed by that statute.

In any event, even if I were to consider the DOC documents and the opinions set forth in the doctors' affidavits, I still would conclude that Marrero has not overcome the presumption of correctness that must be accorded to Judge Connelly's 1994 determinations that he was competent.

---

[13] Once again, Marrero may fault his PCRA counsel, Hathaway, for failing to investigate or present this evidence properly to the state court, "but ineffectiveness of post-conviction counsel is not an exception to § 2254(e)(2)'s requirements." Taylor, 504 F.3d at 437 n.17 (citing 28 U.S.C. § 2254(i); and, Thomas, 428 F.3d at 498 for the proposition that: "[F]ailure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel.*" (emphasis added in Taylor); and, Coleman, 501 U.S. at 752 for the proposition that there is no federal constitutional right to post-conviction counsel).

The DOC records upon which Marrero relies to support his competency claims are from November 1994 and therefore post-date his trial, which concluded on October 25, 1994. As such, those records do not present "clear and convincing" evidence of what Marrero's competency level was during his trial. Rather, they reflect his state of mind *after* his trial had concluded, and that state of mind certainly could have been impacted by the recent court proceeding that had condemned him to death. Moreover, the records indicate that Marrero was diagnosed with major depression with psychotic features, that he was a very poor historian, had a bad memory, and that test data indicated that he is mentally retarded. Although the records demonstrate that Marrero had mental health issues, they do not provide "clear and convincing evidence" that he did not have the cognitive abilities to understand the recently concluded proceeding against him or that he did not have the ability to consult with his trial counsel.

The record does not disclose when Dr. Hopewell and Dr. Kessel performed their evaluations of Marrero, but each of their affidavits are dated "July 1999," and so I shall assume that they evaluated him near that month and date, which would have been more than four years after his trial had concluded. Dr. Hopewell performed a psychological evaluation of Marrero and determined that he suffers from several organic impairments and mental deficits, including dementia, psychotic disorder, and major depressive disorder. (See Doc. No. 8, Ex. C, Hopewell Aff. ¶¶ 3, 25). In contrast to his conduct during Dr. Reilly's examination of him, Marrero "put forward a good effort" during Dr. Hopewell's evaluation, and Dr. Hopewell determined that "he did not malinger[.]" (Id. ¶ 15). Dr. Hopewell concluded that Marrero is "severely limited intellectually" and "is mildly mentally retarded with an IQ ranging in the mid-fifties." (Id. ¶ 18). He opined that Marrero's mental retardation, his lack of memory recall, and the presence of brain damage and dementia would have

rendered him incompetent to stand trial. (Id. ¶¶ 34-35). Dr. Kessel performed a forensic psychiatric evaluation of Marrero and also relied upon Dr. Hopewell's neuropsychological assessment of Marrero. (Doc. No. 8, Ex. D, Kessel Aff. ¶ 2). She concluded that Marrero's "brain damage, dementia, mental retardation, depression and substance-induced psychotic disorder rendered him wholly unable to rationally assist trial and appellate counsel, or to rationally make any of the decisions needed to stand trial and defend himself." (Id. ¶ 11).

I have given Dr. Hopewell's and Dr. Kessel's opinions due consideration, but their opinions, even when considered together with the November 1994 DOC records, do not provide "clear and convincing" evidence sufficient to overcome the presumption of correctness due to Judge Connelly's findings of competency. 28 U.S.C. § 2254(e)(1). Many other considerations balance against Dr. Kessel's and Dr. Hopewell's opinions – such as: (i) Marrero comported himself during the pre-trial and trial proceedings in such a manner that neither Judge Connelly nor Lucas ever questioned his competency (even though they were squarely presented with Marrero's obstinance); (ii) Judge Connelly summarily dismissed Marrero's PCRA claim that he was incompetent because he found it to be so unconvincing; (iii) Lucas testified during the PCRA hearing that he had surmised that Marrero intentionally had stopped cooperating with him in order to create an issue for post-conviction relief; (iv) Dr. Reilly assessed Marrero as a malinger who had deliberately tried to present an unfavorable impression of himself; and, (v) Dr. Kessel and Dr. Hopewell conducted their examinations of Marrero several years after his trial had concluded.

In conclusion, Marrero has failed to demonstrate that he is entitled to habeas relief on his claims that his substantive and procedural due process rights were violated because he was tried while incompetent and because he displayed sufficient indicia to the trial court that he was

incompetent. His next claim is that Lucas was ineffective for not requesting a competency hearing. Ineffective assistance of counsel claims are analyzed under the familiar two pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland's first prong, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Id. at 688; see also Williams, 529 U.S. at 390-91. Strickland's second prong requires that the petitioner show that he was prejudiced by the deficient performance. "This requires showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." Id. at 687. In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Applying Strickland to a claim of ineffective assistance for not requesting a competency hearing, the Third Circuit Court has explained that:

Counsel's failure to request the trial court to order a hearing or evaluation on the issue of the defendant's competency ... could violate the defendant's right to effective assistance of counsel *provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered.*

Taylor, 504 F.3d at 438 (emphasis added) (quoting Jermyn v. Horn, 266 F.3d 257, 283 (3d Cir. 2001)).

Marrero admits that the Pennsylvania Supreme Court adjudicated his ineffective assistance of counsel claim on the merits and that § 2254(d)'s standard of review applies to my review of the claim.[14] (Doc. No. 26 at 23-25). The issue presented to this Court is whether the Pennsylvania

---

[14] Marrero contends that the Pennsylvania Supreme Court's brevity in ruling on this claim indicates that it was "unreasonable" under § 2254(d). I am reminded, however, that AEDPA

Supreme Court's rejection of this claim was "unreasonable application of" Strickland.[15] The application of Section 2254(d)'s standard of review adds another hurdle in addition to the already heavy burden Marrero faces under Strickland. In reviewing whether the Pennsylvania Supreme Court's rejection of his ineffective assistance claim was an "unreasonable application" of Strickland, I am "not authorized to grant habeas corpus relief simply because [I] disagree with the state court's decision or because [I] would have reached a different result if left to [my] own devices." Werts, 228 F.3d at 197. "Under the 'unreasonable application' prong of § 2254(d)(1), 'the question ... is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Abu-Jamal v. Horn, 520 F.3d 272, 279 (3d Cir. 2008) (quoting Schriro, 127 S.Ct. at 1939 (citing Williams, 529 U.S. at 410)).

In support of his contention that Lucas's handling of the competency issue was objectively unreasonable – and that the Pennsylvania Supreme Court's resolution of this claim was an unreasonable application of Strickland – Marrero relies upon two things. First, he directs this Court to an affidavit of Lucas's that is dated July 30, 1999. In that affidavit, Lucas states that after having

---

constrains federal courts to review the results, not the reasoning, of a state court's adjudication. Hollman v. Wilson, 158 F.3d 177, 180 n.3 (3d Cir. 1998); Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1254-56 (11th Cir. 2002) ("The statutory language [of § 2254(d)] focuses on the result, not on the reasoning that led to the result[.]").

[15] The Pennsylvania Supreme Court's adjudication of this claim was not "contrary to" Strickland. In Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987), the Pennsylvania Supreme Court held that Pennsylvania law for judging ineffectiveness corresponds with the Strickland standard. See also Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999); Jacobs v. Horn, 395 F.3d 92, 106 (3d Cir. 2005) ("We have previously ruled that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to Strickland.") (citing Werts v. Vaughn, 228 F.3d 178, 204 (2000)); Williams, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.")

reviewed Dr. Hopewell's assessment of Marrero, he now realizes that he failed to appreciate Marrero's mental health deficits and that he should have insisted on a competency evaluation and hearing. (Doc. No. 8, Ex. B, Lucas Aff. ¶¶ 4-14). He states that he did not "even consider having [Marrero] evaluated for competency purposes. I had no tactic or strategy for failing to have him evaluated for these purposes – it simply did not occur to me to do so." (Id. ¶ 6). Second, Marrero relies upon records from the Erie County Jail that are dated February 4 and 13, 1994, which indicate that on those dates jail officials observed behavior by him that suggested that he had suicidal ideation. (Doc. No. 8, attached to the end of Ex. 1). Marrero contends that Lucas should have reviewed those jail records and that if he would have, he would have been alerted to issues with regard to Marrero's competency.

Marrero first presented Lucas's affidavit and the Erie County Jail records as attachments to the *Motion to Remand* that the Capital Habeas Corpus Unit unsuccessfully attempted to file with the Pennsylvania Supreme Court. Thus – as with the Dr. Hopewell's and Dr. Kessel's affidavits and the November 1994 DOC records – Marrero did not properly present this evidence to the state court to support this ineffective assistance claim. And, he has not demonstrated why he should be permitted to introduce this evidence to this Court now notwithstanding § 2254(e)(2)'s limitations on evidentiary hearings. Accordingly, this Court may not rely upon Lucas's affidavit or the Erie County Jail records to determine whether the Pennsylvania Supreme Court's resolution of this claim was objectively unreasonable under § 2254(d). See e.g., Holland, 542 U.S. at 652. For that reason alone, this ineffective assistance claim fails.

However, even I were to consider Lucas's affidavit and the February 3 and 14, 1994 Erie County Jail records, I still would conclude that Marrero is not entitled to habeas relief. As set forth

-36-

above, Judge Connelly found as fact that Marrero was competent and Marrero has not overcome the presumption of correctness that I must accord to that finding under § 2254(e)(1). Marrero contends that the February 4 and 13, 1994 Erie County Jail records demonstrate that he was incompetent because those records show that on those two dates in February 1994, eight months prior to his trial, he exhibited suicidal behavior. He argues that had Lucas reviewed those records, he would have moved for a competency hearing and Marrero would have been found to be incompetent. Marrero has not shown that the two instances of suicidal ideation well in advance of his trial would have resulted in a finding that he was incompetent at the time of his trial. Compare Taylor, 504 F.3d at 434-35 (even though the petitioner had been suicidal after the murders in May 1991, the record did not indicate that he was actively suicidal at the time of his December 1991 and January 1992 trial proceeding; therefore, suicidal phase did not indicate he was incompetent at trial); Jermyn, 266 F.3d at 293 (early suicide attempt did not implicate competency *vel non* to stand trial); with Drope, 420 U.S. at 178-80 (mid-trial suicide attempt raised doubt as to competency).

Therefore, Marrero cannot show that he was prejudiced by Lucas's alleged deficient performance – *i.e.*, that there is a reasonable probability that he would have been found incompetent had Lucas raised the issue. Strickland, 466 U.S. at 694; Taylor, 504 F.3d at 438. The absence of prejudice precludes relief on this ineffective assistance claim.

This claim also fails for the separate and independent reason that Marrero has not demonstrated that Lucas's representation of him was objectively unreasonable under Strickland. Although Lucas states in his affidavit that he realizes now that he should have raised an issue of Marrero's competency, this admission has the earmarks of one attempting to fall on his sword in

-37-

order to assist a former client.[16] Lucas was an experienced defense attorney, who had handled many homicide cases prior to representing Marrero. (8/6/98 PCRA Tr. at 82-83). He also had prosecuted homicide cases during his previous eight-year employment with the Erie County District Attorney's Office, where he had worked after he graduated from law school in 1973. (Id.) He had spoken on issues related to criminal law, evidence, and trial preparation at seminars put on by the Erie County Bar Association and the Pennsylvania Institute. (Id. at 84-85). Indeed, in his brief to the Pennsylvania Supreme Court, Marrero acknowledged that Lucas's legal career included "a substantial and prominent history of legal counsel and representation of criminal defendants." (*Brief for Appellant*, Commonwealth v. Marrero, Capital Appeal Docket No. 243 of the Pennsylvania Supreme Court, at 9, SCR Vol. 1). Considering Lucas's extensive background and experience in criminal defense and prosecution work, it is hard to credit his belated assertion that it "did not occur to" him to question Marrero's competency. It is far more likely that, even if Marrero has the mental health deficiencies identified by Dr. Hopewell, those deficiencies did not manifest themselves in a manner which caused Lucas to question Marrero's competency to stand trial.

Lucas's conduct during his representation of Marrero also supports the conclusion that he did not raise an issue of competency because Marrero did not indicate to him that he was incompetent, and not because Lucas did not appreciate Marrero's mental health issues and "it did not occur" to him

---

[16] Because Strickland's standard is an objective one, trial counsel's post-trial statements that he performed deficiently are not determinative. See Chandler v. United States, 218 F.3d 1305, 1315 and n.16 (11th Cir. 2000) ("[T]o show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.... We look at the acts or omissions of counsel that the petitioner alleges are unreasonable and ask whether some reasonable lawyer could have conducted the trial in that manner. Because the standard is an objective one, that trial counsel ... admits that his performance was deficient matters little.")

-38-

to do so. Lucas had numerous opportunities to raise an issue of Marrero's competency if in fact Marrero was displaying signs that he could not understand the proceedings against him and could not (as opposed to would not) cooperate with counsel. Yet Lucas never questioned Marrero's competency when litigating the motion to suppress the incriminating statements that Marrero had made to the police after his arrest, during the plea and the plea withdrawal proceedings, when he requested funds for a mental health expert to examine Marrero for the purpose of gathering mitigating evidence for sentencing purposes, or when Marrero challenged his representation at the beginning of his trial and Lucas explained to Judge Connelly the difficulties he had in representing Marrero. Moreover, Lucas testified at the PCRA hearing that it was his belief that Marrero "was trying to set the situation up for [a subsequent post-conviction claim]" by trying to create a situation in which Lucas would later appear to have been ineffective. (8/6/98 PCRA Tr. at 90, 106).

Based on all of the foregoing, Marrero has not demonstrated that the Pennsylvania Supreme Court's denial of his ineffective assistance claim was an "unreasonable application of" Strickland or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d)(1) & (2).

## C.    **Conclusion**

Marrero is not entitled to habeas relief on his four guilt phase claims. At the parties' request, I shall not rule on Marrero's sentencing phase claims at this time, as those claims will become moot in the event that the parties resolve Marrero's Atkins claim in the pending state court proceeding. All proceedings in this matter shall be STAYED while the parties resolve the Atkins claim in state court. Within five days of the completion of the state court proceeding, the parties shall file with this Court a motion requesting that the stay be lifted and informing this Court of the outcome of the state

court proceeding.

Because this is not a final order resolving Marrero's habeas petition, I make no ruling at this time on whether he is entitled to a certificate of appealability on any of his guilt phase claims under 28 U.S.C. § 2253.

This Court's Clerk of Court is directed to return the state court record to the Office of Clerk of Courts, Erie County Courthouse.

BY THE COURT:

*Donetta W. Ambrose*

Donetta W. Ambrose,
Chief U.S. District Judge